[Cite as *State v. Ojile*, 2012-Ohio-6015.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-110677 |
| | | C-110678 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-1006797C |
| | | B-1007149C |
| vs. | : | |
| | | *O P I N I O N.* |
| UGBE OJILE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  December 21, 2012

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Chief Assistant Prosecuting Attorney*,* for Plaintiff-Appellee,

*Robert Alan Brenner, LLC*, and *Robert Alan Brenner*, for Defendant-Appellant.

Please note:  This case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1}     Following a bench trial, defendant-appellant Ugbe Ojile was convicted in two separate cases of six counts of aggravated robbery, one count of robbery, six counts of complicity to robbery, and one count of conspiracy to commit aggravated robbery. *See* R.C. 2911.01(A)(1); R.C. 2911.02(A)(1); R.C. 2923.01(A)(1); R.C. 2923.03(A)(2). Ojile has filed a timely appeal from those convictions, presenting ten assignments of error for review. We find some merit in his arguments. Consequently, we affirm the trial court's judgment in part, reverse it in part, and remand the cause to the trial court.

### I. The Investigation

{¶2}     The record shows that the Cincinnati Police Department and other local police agencies had received a number of reports from local residents who had been followed home and robbed after gambling at the Hollywood (formerly Argosy) and Grand Victoria Casinos in Lawrenceburg, Indiana. The various police agencies formed a task force to apprehend the perpetrators. After many hours of viewing surveillance video from the casinos, police focused their attention on Ojile and co-defendant Kenyatta Erkins. Police officers eventually obtained a warrant to put a GPS tracking device on a dark green Dodge Magnum that Erkins frequently drove. They also obtained a warrant to record the cell phone conversations between Erkins and Ojile.

{¶3}     Police discovered that Erkins and Ojile used the same method of operation in each case. Erkins would go into the casino and look for victims who were carrying large amounts of cash, and who he and Ojile believed would be easy targets. They often targeted gamblers who appeared to be Asian because they

believed those individuals would be less likely to call the police. Ojile would wait in a car outside the casino because he had been banned from entering the Hollywood. Erkins would call Ojile and discuss specific "targets." They would wait for the "targets" to leave and follow them home. When the victim got out of his or her car, they would approach the victim at gunpoint and steal the victim's money and other valuables. Erkins's girlfriend, Amy Hoover, also participated in a few of the robberies.

{¶4} On October 7, 2010, police officer Kyle Ingram was working undercover in the Hollywood Casino, posing as an elderly gambler. He walked around slowly with a cane, and when he saw Erkins walking past him, he pulled a large amount of cash out of his pocket and started to count it. Erkins saw him and called Ojile to report that he had a "target."

{¶5} When Ingram left the casino, Erkins followed him to the parking lot. Ingram got into his van and left. Erkins got in the Dodge Magnum with Ojile and followed Ingram's van. Ingram left the highway on a predetermined exit and pulled into a gas station. The Magnum pulled into the parking lot of a nearby Waffle House. Police surrounded the car and arrested Erkins and Ojile.

{¶6} Police searched the Magnum and found a backpack that contained a .40-caliber Glock handgun, a live round of ammunition, and a BB gun. They also found three cell phones, a black hooded sweatshirt, camouflage gloves, Ojile's personal papers, and papers belonging to one of the robbery victims. In the trunk, they found duct tape that had been used to tie up one of the robbery victims.

{¶7} Police also executed a search warrant at the apartment where Ojile and his girlfriend, Nikki Williams, lived. They found a .40-caliber Glock Magnum handgun with a magazine containing 11 rounds of ammunition, as well as additional

.40-caliber ammunition. They also found a driver's license, a bank card and a social security card belonging to one of the robbery victims.

## II. The Robberies

### A. Michael Weisbrod

{¶8}    On February 9, 2009, Michael Weisbrod, a professional poker player, went to what was then the Argosy Casino and won over $8,000. Surveillance tapes from the casino showed that Erkins was following Weisbrod that night. Weisbrod drove home to his apartment in Oakley, arriving after 1:00 a.m. Shortly after he arrived home, a young woman knocked on his door and asked him if anyone was living in the apartment downstairs. Without opening the door, Weisbrod told her "no," and she left.

{¶9}    The following night, something similar occurred. After hearing a knock on his door, Weisbrod looked through the peephole and saw a man at the door. The man asked if anyone was living in the downstairs apartment. Weisbrod said "no," and the man walked away. Weisbrod watched him until he was out of sight.

{¶10}   Shortly after 9:00 p.m. the next night, February 11, 2009, Weisbrod was home alone when all the lights in the room suddenly went off. Because his neighbors still had electricity, Weisbrod went to the basement of his apartment building to look for the circuit breaker, using the light from his cell phone to see.

{¶11}   As Weisbrod neared the circuit breaker, someone yelled for him to get down on the ground, which he did. He was then attacked by what he believed to be two people, a male and a female. They informed him that they had a gun. They proceeded to tie his hands and legs with duct tape, and ordered him to tell them where the money was. Weisbrod told them that it was in his dresser.

{¶12}   The woman went upstairs.   When she returned, she said that the money was not there.  The attackers threatened Weisbrod and poked him in the back of the head with the gun.  Weisbrod clarified that the money was in the nightstand next to his bed.  The woman went back upstairs and retrieved the money.  After threatening Weisbrod again, the attackers left.

{¶13}   Weisbrod freed himself and asked his neighbors to call the police. The robbers stole between $8,000 and $9,000 in cash, and Weisbrod's cell phone, wallet and car keys.  He could not identify the robbers at the time, although Hoover later testified that she was the woman who had knocked on his door and who had retrieved the money during the robbery.

{¶14}   On April 3, 2009, Weisbrod won over $8,000 at the Hollywood Casino.  He left after midnight and made sure that no one followed him.  When he turned into the driveway leading to his apartment, he noticed that one of the motion-activated lights was on, which caused him concern.  Nevertheless, he drove around to the back of his apartment building and got out of his car.

{¶15}   When he was trying to get in the door of his apartment, two African-American men approached him.  He described them as being of medium build and wearing hoods and jeans.   They pulled out a gun, threatened him, and ordered him to get on the ground.  They reached into his pockets and took his wallet and cash. They then fled from the scene in a white SUV.

{¶16}   The area was well-lit and Weisbrod was able to get a good look at his attackers.  He told the investigating officer that if he saw the men again, he could identify them.   Six months later, Weisbrod saw television news stories about the arrest of Erkins, Ojile and Hoover.  He identified Erkins and Ojile as the men who had robbed him the second time.  He recognized Hoover as the women who had

knocked on his door before the earlier robbery. Ojile told details about the first robbery of Weisbrod to Tyrone Tanks, another inmate at the Hamilton County Justice Center.

### B. Davis Nguyen

{¶17} On May 29, 2009, Davis Nguyen went to the Hollywood Casino and won approximately $2,000 playing roulette. He left the casino between 3:00 and 4:00 a.m. When he arrived at his home in Delhi, he was sitting in his car talking on his cell phone when he saw an African-American man behind a bush. Nguyen got out of his car and walked over to where the man was standing. The man walked away.

{¶18} Nguyen followed the man, who pulled out a gun and ordered Nguyen to return to his car. The man ordered Nguyen to lie down on the floor of the car and then stole Nguyen's roulette winnings, cell phone and wallet. Nguyen's wallet contained his driver's license, social security card, and bank card. The attacker fled in a white SUV.

{¶19} When Ojile was arrested, the police seized Ojile's wallet. Inside, they found a business card with Nguyen's name, date of birth, address and social security number handwritten on the back.

{¶20} At trial, Nguyen testified that he was 90 percent sure that Ojile was his attacker. Further, Tanks testified that Ojile had told him that he had been driving a Ford Escalade during one of the robberies, and that Ojile feared that the victim of that robbery could identify it.

### C. Daniel Duncan

{¶21} Daniel Duncan was a professional gambler who played poker frequently. He had seen Ojile and Erkins at another casino in Indiana on a number

of occasions. He had also seen Erkins at the Hollywood Casino a number of times. He testified that sometimes Erkins played and sometimes he watched, and that it was not unusual to see Erkins on the phone when he was watching.

{¶22} On April 18, 2010, Duncan was at the Hollywood playing poker. He cashed out his chips and left to drive to his apartment in Oakley. He had been robbed before, and was carrying .40-caliber Glock in his back pocket. He also carried Smith and Wesson ammunition. But Duncan was angry because he had lost a substantial sum of money that night, and he was not paying attention to see if anyone was following him when he left the casino.

{¶23} When he arrived at his apartment, he parked in one of the open parking spaces. As soon as he opened his car door, a person he described as a six-foot African-American male wearing a black "hoody," black pants and a black bandana across his face, pointed a gun at his head. Duncan stumbled and his gun slid out of his pocket. Duncan's attacker patted him down and ordered him to empty his pockets. The attacker stole Duncan's gun, as well as approximately $1,250 and several other items.

{¶24} When Ojile was arrested, the police searched a backpack that was located between his legs. Inside the backpack, they found Duncan's .40-caliber Glock and his Smith and Wesson ammunition. Ojile had admitted to Tanks that he had been involved in a robbery where the victim had stumbled and the victim's gun had slid out of the victim's pocket, and that he had stolen that gun.

### D. Tien Dao

{¶25} On June 28, 2010, Tien Dao, a native of Vietnam, played poker at the Hollywood Casino. He left with $1,500, and drove to his home in Colerain Township. He pulled into his driveway at about 2:00 a.m. Even though he could not

get into his garage because a car was blocking his path, he opened his garage door using his remote garage-door opener. It was raining, so he waited a few minutes and then quickly ran toward his garage.

{¶26} When Dao got into the garage, a man wearing a black shirt and mask and brandishing a gun tried to grab him. A second man, also wearing a mask and brandishing a gun, arrived. Dao tried to get inside of his house, but one of the men hit him in the head twice with the gun. Dao still managed to get inside of his house, but both of his attackers followed him inside. They took Dao's wallet and fled. Dao had his social security card, two California driver's licenses and credit cards in his wallet.

{¶27} After Ojile's arrest, the police searched his apartment. During that search, they found Dao's two California driver's licenses, his social security card, and his credit card. Additionally, video surveillance tapes showed Erkins following Dao as he left the casino on June 28.

### E. Alan Boogher

{¶28} On September 7, 2010, Alan Boogher was playing craps at the Grand Victoria Casino while his wife stood by him. He had had a successful night, and surveillance tape showed him collecting substantial winnings at the cash payout window. He and his wife left the casino shortly after midnight.

{¶29} Surveillance tapes showed Ojile, who was not banned from the Grand Victoria, in the area where Boogher was gambling. When Boogher and his wife got into their car to leave the casino, Ojile got into a black Volkswagen Jetta owned by Nikki Williams, Ojile's girlfriend, and followed Boogher's car. Erkins, driving the Dodge Magnum, also followed them.

{¶30} Boogher and his wife live near Dayton, Ohio. On their way home, they stopped at a rest area. The Magnum and the Jetta also pulled into the rest area near them. The Booghers switched drivers, and then left the rest area without using the facilities. Ojile and Erkins followed them a short distance, but then turned around and headed south toward Cincinnati.

### F. Sun Xinyu

{¶31} On September 8, 2010, the police observed Ojile's car leaving the Hollywood Casino and following a white Lexus driven by Sun Xinyu. Police officers observed Ojile as he followed Xinyu's vehicle to Xinyu's apartment in Clifton. Xinyu drove into the parking lot of the apartment complex. While Ojile was looking for a parking spot, Xinyu and his female companion got out of their car and went into their apartment. The police officers followed Ojile as he left and went home.

### G. Lawrence Adams

{¶32} On September 15, 2010, police officers saw Ojile driving the Volkswagen Jetta as he followed Lawrence Adams from the Hollywood Casino. Ojile followed Adams to Kellogg Avenue in Anderson Township where a uniformed police officer was waiting. The police officer stopped Adams's car under the guise of a traffic stop to prevent another robbery. Nevertheless, the Jetta continued to circle the area during the traffic stop. Because Ojile was still in the area, police officers followed Adams to his home to prevent him from being robbed. Video surveillance tapes showed Ojile following Adams as he left the casino.

### H. Kiran Racherla

{¶33}   Kiran Racherla went with a friend to the Hollywood Casino to play blackjack.  He won approximately $100.  He and his friend left the casino at 5:00 a.m. on October 3, 2010, and drove to Racherla's apartment complex in Blue Ash.

{¶34}   After Racherla parked his car, he became alarmed at the sight of a man who had emerged from behind a tree.  He woke his friend, who had been sleeping, and the two of them got out of the car.  Racherla attempted to call 911 from his cell phone.  His friend attempted to open the apartment door, but was having trouble, so he fled, leaving Racherla alone.

{¶35}   At that point, an African-American male, wearing a dark mask and hood and brandishing a gun, ordered Racherla to sit on his knees.  Racherla refused, and told his attacker that the police were coming.  Upon hearing a siren, Racherla tried to flee but the attacker struck him three times with the gun and threatened to shoot him.  The attacker put his hand in Racherla's left pants pocket, pulled out his cell phone headset, threw it on the ground, and fled.

{¶36}   The Blue Ash police arrived, and paramedics took Racherla to the hospital.  He had large a gash in his head that required staples to close.  Again, surveillance tapes showed Erkins following Racherla as he left the casino that night. The police also had cell phone records showing that Ojile's cell phone was in the Blue Ash area the night of the attack.  Additionally, when Erkins and Ojile were arrested, police recovered from their car a gun that had been stolen from Daniel Duncan, another robbery victim.  Racherla's DNA was found on that gun.

### I. Michael Li and Tony Quach

{¶37}   On October 6, 2010, Michael Li and Tony Quach, both residents of Columbus, Ohio, left the Hollywood Casino at approximately 10:00 p.m.  The police

had already arrived at the casino and had set up surveillance. They were also monitoring the cell phone conversations between Erkins and Ojile. From those conversations, the police officers determined that Li and Quach were the intended "targets." Li and Quach left the casino parking lot in a black Lexus. Erkins and Ojile followed them in the Dodge Magnum onto Interstate 275. The police stopped Li's and Quach's car under the pretense of a traffic stop to prevent them from being robbed. When the stop was made, the police officers saw Ojile slam his fist on the steering wheel, seemingly in frustration.

### III.  Judgment Entry Issues

{¶38}   In his first assignment of error, Ojile contends that the court erred in convicting him of robbery in count one of the case numbered B-1006797C because he was indicted for conspiracy to commit robbery in that count. He argues that he could not be convicted of a crime for which he was not indicted, and that robbery is not a lesser-included offense of conspiracy to commit robbery. This assignment of error is well taken.

{¶39}   The record shows that in the case numbered B-1006797C, the trial court correctly convicted Ojile of robbery in count two. But, as Ojile contends, count one of the indictment charged him with conspiracy to commit robbery. The judgment entry mistakenly stated that Ojile was found guilty of robbery in count one for the same offense. A defendant cannot be convicted of conspiracy to commit robbery and robbery for the same offense. R.C. 2923.01(B); *State v. Truitt*, 1st Dist. No. C-050188, 2011-Ohio-1885, ¶ 17-18.

{¶40}   Even though the trial court merged the sentence imposed on count one with the sentence imposed on count two, the finding of guilt on count one was improper. Consequently, we sustain Ojile's first assignment or error. We reverse the

finding of guilt on count one in the case numbered B-1006797C, and we remand the cause to the trial court to vacate that finding of guilt.

{¶41} In his second assignment of error, Ojile contends that the trial court erred by changing its verdicts. He argues that the trial court had originally convicted him of four counts of conspiracy to commit robbery and one count of conspiracy to commit aggravated robbery, offenses for which he was not indicted, and later improperly changed the verdicts to guilty of complicity to robbery. This assignment of error is not well taken.

{¶42} The record shows that the trial court incorrectly stated in its original judgment entry that it had convicted Ojile of five counts of conspiracy to commit robbery and one count of conspiracy to commit aggravated robbery, crimes for which he had not been charged. The trial court subsequently realized its mistake, and journalized an entry nunc pro tunc stating that Ojile had been convicted of five counts of complicity to robbery and one count of complicity to aggravated robbery, which were the correct offenses. A charge of complicity can be stated in terms of the complicity statute or in terms of the principal offense, and the defendant is put on notice that he can be convicted as a principal offender or an accomplice. R.C. 2923.03(F); *State v. Alexander*, 1st Dist. No. C-110035, 2012-Ohio-460, ¶ 31.

{¶43} Thus, the record shows that the court did not change its verdicts. It simply corrected a clerical error, which is permissible under Crim.R. 36. *State v. Valdez*, 5th Dist. No. 05-CA-00094, 2006-Ohio-3298, ¶ 88-92; *State v. Lattimore*, 1st Dist. No. C-010488, 2002 Ohio App. LEXIS 731, *5-6 (Feb. 22, 2002). Consequently, we overrule Ojile's second assignment of error.

{¶44} In his third assignment of error, Ojile contends that the trial court erred when it stated in the final judgment entry that he had been found guilty of

count four in the case numbered B-1007149C and when it imposed a three-year sentence on that count. We agree. The record shows that the trial court had stated in a previous entry that it had found Ojile not guilty of that count.

{¶45} That finding of not guilty was final. Changing the finding to guilty in the later entry went beyond correcting a clerical error, and violated Ojile's double-jeopardy rights. *See Kepner v. United States*, 195 U.S. 100, 130, 24 S.Ct. 797, 49 L.Ed. 114 (1904). Consequently, we sustain Ojile's third assignment of error. We remand the matter to the trial court to vacate the conviction on count four.

{¶46} Finally, we note that the judgment entries in these cases contain a number of typographical errors. In the case numbered B-1006797C, the judgment entry incorrectly states that in count two, Ojile was convicted of robbery under R.C. 2911.01(A)(1). He was actually convicted under R.C. 2911.o2(A)(1). In the case numbered B-1007149C, the judgment entry incorrectly states that Ojile was convicted in counts 22, 23, 25, 28 and 29 of complicity to robbery under R.C. 2923.03(A)(4). He was actually convicted under R.C. 2923.03(A)(2). Consequently, we also remand this cause to the trial court to correct the typographical errors in the judgment entries. *See* Crim.R. 36; *Lattimore* at *4-5.

### IV. Weight and Sufficiency

{¶47} In his fourth assignment of error, Ojile contends that the evidence was insufficient to support his convictions. He contends that the state failed to prove the essential elements of the various offenses. This assignment of error is not well taken.

{¶48} The relevant inquiry, when reviewing the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses proved

beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Russ*, 1st Dist. No. C-050797, 2006-Ohio-6824, ¶ 13.

{¶49} R.C. 2911.01(A)(1), aggravated robbery, provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or the offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.02(A)(1), robbery, provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person, or under the offender's control."

{¶50} Ojile argues that the state failed to prove the five counts of complicity to robbery, which were the counts involving Ingram, Boogher, Xinyu, Adams, Li and Quach. He argues that he never made contact with any of these victims and that no theft offense was actually committed. We disagree.

{¶51} Robbery under R.C. 2911.02(A)(1) is "an offense which itself prohibits an attempt." *State v. Still*, 11th Dist. No. 93-L-195, 1994 Ohio App. LEXIS 5506, *5 (Dec. 9, 1994). A criminal attempt occurs when an offender "purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus, *overruled on other grounds, State v. Downs*, 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977). A substantial step involves conduct that is "strongly indicative of the actor's criminal purpose." *State v. Andrews*, 171 Ohio App.3d 332, 2007-Ohio-2013, 870 N.E.2d 775, ¶ 78 (1st Dist.), quoting *Woods* at paragraph one of the syllabus. This standard

focuses on the defendant's overt acts that convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention to prevent the crime when the criminal intent becomes apparent. *Woods* at 132; *State v. Holmes,* 181 Ohio App.3d 397, 2009-Ohio-1241, 909 N.E.2d 163, ¶ 19 (8th Dist).

{¶52} R.C. 2923.03(A)(2), the complicity statute, states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." To aid or abet is to assist or facilitate the commission of a crime, or to promote its accomplishment. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus; *Holmes* at ¶ 20 (8th Dist.); *Russ*, 1st Dist. No. C-050797, 2006-Ohio-6824, at ¶ 18.

{¶53} In the cases of Boogher and Li and Quach, the evidence showed that Ojile and Erkins, acting in concert, had targeted them as their intended victims. One of them followed the victims out of the casino, consistent with the modus operandi in the other robberies. They then followed the victims' cars, but were prevented from actually committing a theft offense. Thus, the evidence showed they took substantial steps showing their criminal purpose to rob the victims. They would have carried out the underlying theft offenses had they not been prevented from doing so. Thus, there was sufficient evidence to support the complicity to robbery convictions involving those victims.

{¶54} The same is true of the counts in which Ingram was the intended victim. Ojile contends that the evidence showed only that he and Erkins simply had left the interstate and stopped at the same exit as Ingram. We disagree. Their cell phone conversations showed that they had specifically targeted Ingram as a victim. Erkins had followed Ingram out of the casino. He and Ojile then followed Ingram's car on the highway until he got off at the exit, and they parked near where Ingram

had parked. Thus, they took substantial steps showing that they intended to rob Ingram. It did not matter that the object of their intent was factually or legally impossible if they could have committed the offense had the circumstances been what they believed them to be. *See Andrews*, 171 Ohio App.3d 332, 2007-Ohio-2013, 870 N.E2d 775, at ¶ 80.

{¶55} Ojile argues that the evidence was insufficient on the complicity to robbery counts involving Adams and Xinyu because he was the only defendant indicted on those counts. But R.C. 2923.03(B) states that "[i]t is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender." Therefore, the state was not required to either identify or charge an individual as a principal offender to obtain convictions against Ojile as a complicitor. *See State v. Gowdy*, 6th Dist. No. E-06-071, 2009-Ohio-385, ¶ 21.

{¶56} Next, Ojile contends that the state's evidence was insufficient to support the aggravated robbery conviction related to the first Weisbrod robbery. But he is simply arguing that the state's evidence, particularly the testimony of Hoover and Tanks, was not credible. These arguments go to the weight of the evidence, not its sufficiency, which is a separate concept. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Jones*, 1st Dist. No. C-090137, 2010-Ohio-4116, ¶ 42. Further, matters as to the credibility of evidence were for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116.

{¶57} Finally, Ojile argues that the evidence was insufficient to support his conviction for conspiracy to the commit aggravated robbery involving Racherla. He contends that the state's evidence connected Erkins to that robbery, but not him.

16

The state presented cell phone records showing that Ojile's cell phone was in the same area as the robbery. When both Ojile and Erkins were arrested, the police recovered a gun from their car that had been stolen from Duncan, which contained Racherla's DNA. Further, the modus operandi of the robbery of Racherla was the same as that employed in the other robberies committed by both Ojile and Erkins. Consequently, there was sufficient evidence connecting Ojile to that robbery.

{¶58} In sum, our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the state had proved all the elements of aggravated robbery, robbery, and complicity to robbery. Therefore, the evidence was sufficient to support the convictions, and we overrule Ojile's fourth assignment of error.

{¶59} In his sixth assignment of error, Ojile contends that his convictions were against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse Ojile's convictions and order a new trial. Therefore, the convictions were not against the manifest weight of the evidence. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Blair*, 1st Dist. Nos. C-100150 and C-100151, 2010-Ohio-6310, ¶ 24. As we previously stated, Ojile primarily argues that the witnesses' testimony was not credible, but matters as to the credibility of witnesses were for the trier of fact to decide. *Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 116; *Blair* at ¶ 23. We overrule Ojile's sixth assignment of error.

### V. Search and Seizure

{¶60} In his fifth assignment of error, Ojile contends that the trial court erred by denying his motion to suppress evidence. He argues that his arrest, and the subsequent search of his backpack and wallet, violated his Fourth Amendment rights. This assignment of error is not well taken.

{¶61} Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Fisher*, 1st Dist. No. C-080497, 2009-Ohio-2258, ¶ 7.

{¶62} An arrest without a warrant requires probable cause. In determining whether probable cause to arrest existed, a court must ascertain whether, at the time of the arrest, the police officer had sufficient facts and circumstances within his knowledge to warrant a prudent person in believing that the defendant was committing or had committed an offense. *State v. Heston*, 29 Ohio St.2d 152, 155-156, 280 N.E.2d 376 (1972); *State v. Ruehlmann*, 1st Dist. No. C-100784, 2011-Ohio-6717, ¶ 13; *Fisher* at ¶ 10. The court can consider the collective knowledge of police officers involved in a common investigation in determining whether probable cause existed. *State v. Henderson*, 51 Ohio St.3d 54, 57, 554 N.E.2d 104 (1990); *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, 882 N.E.2d 945, ¶ 14 (1st Dist.).

{¶63} Before they stopped and arrested Erkins and Ojile, the police had seen surveillance video of Erkins following casino patrons who were later robbed at gunpoint at their homes. On the night of the arrest, police had recorded cell phone conversations between Erkins and Ojile in which they conspired to rob casino

patrons. They specifically targeted Ingram, the undercover police officer posing as a disabled casino patron. Video surveillance tapes showed Erkins following Ingram as he left the casino. Erkins and Ojile then got into the Dodge Magnum that had been involved in several other robberies and followed Ingram's car until Ingram exited from the interstate and stopped. Then the police surrounded the Magnum and arrested Erkins and Ojile.

{¶64} The record shows that the police knew sufficient facts to warrant a prudent person in believing that Erkins and Ojile were committing or had committed robbery. Therefore, the officers had probable cause to arrest them.

{¶65} Ojile also argues that the warrantless search and seizure of his backpack and wallet from the Dodge Magnum in which he was arrested violated his Fourth Amendment rights. We disagree. The record shows that these items were discovered as part of a valid inventory search of the Magnum.

{¶66} An inventory search of a lawfully-impounded vehicle is an exception to the general prohibition against warrantless searches. *State v. Hathman*, 65 Ohio St.3d 403, 405-406, 604 N.E.2d 743 (1992). To satisfy constitutional requirements, the inventory search must be conducted in good faith and "in accordance with reasonable standardized procedure(s) or established routine." *Id.* at paragraph one of the syllabus; *State v. Glenn*, 1st Dist. Nos. C-000206 and C-000210, 2000 Ohio App. LEXIS 4843, *9 (Oct. 20, 2000). While those procedures need not be in writing, the state must show that the police department has a standardized, routine policy, and that the officer's conduct conformed to that policy. *State v. Flynn*, 3d Dist. No. 13-06-11, 2006-Ohio-6683, ¶ 17; *State v. Bozeman*, 2d Dist. No. 19155, 2002-Ohio-2588, ¶ 23. If, during a valid inventory search, a law-enforcement official discovers a closed container, the container may be opened as part of the inventory

process if a standardized policy or practice exists governing the opening of closed containers. *Hathman* at paragraph two of the syllabus.

{¶67} After Erkins and Ojile were arrested, the police had no choice but to impound the Dodge Magnum since there was no occupant left to drive it. It was later towed to the Hamilton County Sheriff's impound lot. The inventory officer searched the car according to the standard procedural manual for the inventory search of impounded vehicles. As provided in the manual, the officer cataloged every item found in the car, including Ojile's backpack and wallet. The officer left the items where they were found, photographed them, and recorded them on the proper form, as required by the policy manual. The officer also followed the manual provisions in opening the backpack, wallet and other closed containers.

{¶68} Because the officer conducted the search in good faith and did not use it as a ruse to uncover evidence of a crime, it was a valid inventory search. *See Hathman* at 407; *Glenn* at *9-10. The search did not violate Ojile's Fourth Amendment rights, and the trial court did not err in overruling his motion to suppress. We overrule Ojile's fifth assignment of error.

### VI. Ineffective Assistance of Counsel

{¶69} In his seventh assignment of error, Ojile contends that he was denied the effective assistance of counsel. He argues that his attorney's performance was deficient because he failed to move to exclude the statements Ojile had allegedly made to Tanks while in jail, and that he was prejudiced by that failure. This assignment of error is not well taken.

{¶70} A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *State v. McCrary*,

1st Dist. No. C-080860, 2009-Ohio-4390, ¶ 12. To sustain a claim for ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *McCrary* at ¶ 12.

{¶71} Tanks testified that Ojile had started talking to him shortly after Tanks arrived at the jail in February 2011. Eventually, Ojile made incriminating statements about the robberies. Tanks reported those statements to the state. He met with prosecutors in early April 2011. Ojile claims that the state "must have known that Tanks would continue to garner incriminating information from Ojile" after he had spoken with prosecutors, in violation of Ojile's Sixth Amendment right to counsel. *See Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Therefore, he contends, counsel's performance was deficient because he failed to move to exclude Tank's testimony.

{¶72} Ojile has failed to meet his burden to show that he was prejudiced by his counsel's failure to move to exclude Tanks's testimony. The record does not support Ojile's claim that Tanks provided damaging testimony about any specific statements Ojile had made after Tanks had met with prosecutors. Even Ojile acknowledges that "it was not clear from his testimony what Tanks learned after his meeting with the State." Further, even if the admission of Tanks's testimony was improper, we cannot say that it was prejudicial in the overall context of the trial given the overwhelming evidence against Ojile. *See State v. Hirsch*, 129 Ohio App.3d 294, 315, 717 N.E.2d 789 (1st Dist.1998). We, therefore, overrule Ojile's seventh assignment of error.

### VII. Identification Evidence

{¶73} In his eighth assignment of error, Ojile contends he was denied a fair trial when the trial court allowed Weisbrod to identify Ojile in court as one of the persons who robbed him. He argues that because the in-court identification was the result of an unreliable pretrial identification produced by unduly suggestive pretrial techniques used by the state, the trial court should not have allowed the in-court identification into evidence. This assignment of error is not well taken.

{¶74} We first note that Ojile failed to file a motion to suppress the identification evidence. Therefore, he waived any error, except plain error. *State v. Bates*, 1st Dist. No. C-040698, 2005-Ohio-3394, ¶ 16-18; *State v. Williamson*, 2d Dist. No. 19832, 2003-Ohio-6541, ¶ 17.

{¶75} Although Ojile argues about the in-court identification, his main complaint is that the pretrial identification was unreliable. Generally, a trial court must suppress a pretrial identification of a suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the circumstances. *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992); *State v. Bell*, 1st Dist. No. C-030726, 2004-Ohio-3621, ¶ 16. The defendant bears the burden of proving both prongs of the test. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Smith*, 1st Dist. Nos. C-080712 and C-090505, 2009-Ohio-6932, ¶ 16. Suggestive identification procedures are unreliable if they create a substantial likelihood of misidentification. *Waddy* at 439; *Smith* at ¶ 16.

{¶76} The record shows that when Weisbrod was robbed the second time, it occurred in the well-lit parking lot of his residence. He was able to get a good look at the faces of his attackers. He told the investigating police officer that if he saw the

attackers again, he would be able to identify them. Several months later, Weisbrod saw news reports about the arrest of Hoover, Erkins and Ojile, which displayed pictures of them. Weisbrod recognized them and was able to identify them to the police.

{¶77} Witness exposure to photographs of the suspect shown on television before the identification does not require suppression of the identification. If no state action was involved in any pretrial exposure to a television news cast showing the defendant's picture, any alleged suggestiveness goes to the weight and credibility of the witness's testimony, rather than to its admissibility. *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 55 (10th Dist.); *State v. Ward*, 10th Dist. No. 00AP-241, 2001 Ohio App. LEXIS 588, *8-11 (Feb. 20, 2001), citing *State v. Brown*, 38 Ohio St.3d 305, 310-311, 528 N.E.2d 523 (1988).

{¶78} The record shows that both Weisbrod's pretrial identification and his subsequent in-court identification of Ojile were reliable and that there was no likelihood of misidentification. The in-court identification was the result of Weisbrod's previous identification of Ojile. Consequently, Ojile has failed to show that the court erred in allowing Weisbrod's in-court identification of Ojile, must less that it committed plain error. We overrule Ojile's eighth assignment of error.

### VIII. Perjured Testimony

{¶79} In his ninth assignment of error, Ojile contends that the state denied him a fair trial through the use of perjured testimony. He contends that Hoover lied about Ojile's participation in the first robbery of Weisbrod. This assignment of error is not well taken.

{¶80} "The state may neither suborn perjury, nor introduce testimony it knows or should know is false without correcting it." (Citations omitted.) *State v.*

*Sanders*, 92 Ohio St.3d 245, 271, 750 N.E.2d 90 (2001). A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if any reasonable likelihood exits that the false testimony could have affected the jury's judgment. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *State v. Klein*, 1st Dist. Nos. C-040176 and C-040224, 2005-Ohio-1761, ¶ 35.

{¶81} Nothing in the record shows that Hoover's testimony was false or that the state knew or reasonably should have known that it was false. Ojile argues that Hoover lied because she testified that both Ojile and Erkins were with her the first time that Weisbrod was robbed. Ojile points to Weisbrod's testimony that he was robbed by one male and one female. But Weisbrod also testified that the first robbery occurred in complete darkness and that he could not identify his attackers in the dark. The trier of fact could reasonably have found that he was mistaken about the number of attackers.

{¶82} Ojile also contends that the state knew that he had an alibi for that robbery and for some of the others. He presented evidence showing that he had purchased tickets on flight out of Ohio on the day in question. But Ojile did not present any evidence that he was actually on the flight. To the contrary, Tanks testified that Ojile had told him that he was going to use the plane tickets to create a false alibi.

{¶83} Additionally, both Ojile's and Erkins's counsel thoroughly cross-examined Hoover. Ojile is simply attacking Hoover's credibility. But matters as to the credibility of evidence were for the trier of fact to decide. *Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 116. Consequently, we overrule Ojile's ninth assignment of error.

### IX. Right to Confrontation

{¶84} In his tenth assignment of error, Ojile contends that he was denied his Sixth Amendment right to confront the witnesses against him. He argues that evidence found in his residence during the execution of the search warrant was used against him, but that the police officer who found these items did not testify. Therefore, he did not have any opportunity to cross-examine that officer. This assignment of error is not well taken.

{¶85} A defendant's right to confront witnesses may be violated when a witness testifies to matters outside of the witness's personal knowledge. *See State v. Miller*, 42 Ohio St.2d 102, 104-106, 326 N.E.2d 259 (1975); *State v. Steen*, 4th Dist. No. 93CA49, 1994 Ohio App. LEXIS 3256, *17-19 (June 28, 1994); *State v. Savoia*, 76 Ohio App.3d 201, 205-206, 601 N.E.2d 193 (10th Dist.1991). The record shows that Agent William Crock testified at trial. He was a member of the team executing the search warrant. He was personally present when the search warrant was executed and the incriminating evidence was recovered, although he did not recover it himself. Nothing in the record shows that Crock did not personally observe the recovery of the items or that he testified to anything outside of his personal knowledge. *See* Evid.R. 602.

{¶86} Further, Ojile had an opportunity to cross-examine Crock regarding his knowledge of the recovered items. *See State v. Adams*, 1st Dist. Nos. C-000388, C-000389 and C-000390, 2001 Ohio App. LEXIS 3737, *13-14 (Aug. 24, 2001). Therefore, the record does not show that Ojile's right to confront the witnesses against him was violated. We overrule his tenth assignment of error.

### *X. Summary*

{¶87}  In sum, we reverse the conviction on count four in the case numbered B-1007149C and the finding of guilt on count one in the case numbered B-1006797C. We remand the cause for the trial court to vacate that conviction and that finding of guilt, and to correct the clerical errors in the judgment entries.  We affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**HILDEBRANDT, P.J.,** and **HENDON, J.,** concur.

Please note:

The court has recorded its own entry this date.