[Cite as *State v. Williams*, 2014-Ohio-1526.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-130277 |
| | | TRIAL NO. B-1203511 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| CHRISTOPHER WILLIAMS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed.

Date of Judgment Entry on Appeal:  April 11, 2014

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Elizabeth E. Agar*, for Defendant-Appellant.

Please note:  This case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1} Defendant-appellant Christopher Williams appeals his convictions for murder under R.C. 2903.02(A), with accompanying firearm specifications, and having weapons while under a disability under R.C. 2923.13(A)(2). We find no merit in his five assignments of error, and we affirm the trial court's judgment.

## I.   Factual Background

{¶2} Evidence presented at a jury trial showed that during the afternoon of May 19, 2012, Demarco Thompson and his girlfriend, Robin Taylor, were visiting Winton Terrace. While driving through the neighborhood, Taylor saw Williams, known as "Network," walking around the area. He stood out because he was dressed in a turquoise shirt and hat. Taylor dropped Demarco off to visit some friends and left to run an errand.

{¶3} Those friends were sisters Jessica and Tonice Thompson. Even though they shared the same last name as Demarco, they were not related to him. It was a warm, sunny day, and Jessica and Tonice were watching their children, as well as other neighborhood children, play with a water hose. They were standing in front of a next-door neighbor's house when Demarco came over to chat.

{¶4} Jessica and Tonice saw a green van drive by, which Demarco seemed to recognize. He told Tonice to go inside her house. As Tonice gathered the children, she recognized a man who had threatened her and Jessica during a previous run-in. Tonice stated that he wore a blue shirt and hat, and had tattoos on his neck. The man, who was accompanied by another man, approached Demarco. The man in the blue shirt and hat started arguing with Demarco. The man told Demarco that he would "air it out," meaning that he would start shooting.

{¶5} Tonice had just reached her doorway when she heard three gunshots. She saw Demarco fall after the second shot. The shooter was standing over Demarco when he fired the third shot. As soon as he was hit, Demarco yelled, "I'm shot, I'm shot, call the police." He fell to the ground, and rolled down a grassy slope, landing in front of Tonice's porch. Tonice saw the shooter run from the scene, carrying a small black gun.

{¶6} Jessica testified that as she was talking with Demarco, she saw a van drive towards them. She identified Williams as a passenger in the van. She and Demarco walked down the street to see where the van had gone, when Williams and another man "popp[ed] out of nowhere" and approached them. She testified that Williams was wearing a blue polo shirt and blue hat.

{¶7} According to Jessica, Demarco told both her and Tonice to go inside the house. But Jessica did not go because she was afraid and because Demarco had her phone. Williams confronted Demarco and accused Demarco of saying that he was going to kill Williams. Williams added that he was going "to air this shit out on my mama," which alarmed Jessica because on a prior occasion, Williams had confronted her and used the same words.

{¶8} Jessica stated that Williams immediately pulled a gun out from under his shirt and began shooting. The first shot hit Demarco in the leg. After the second shot, Demarco fell to the ground. Williams stood over Demarco as he lay on the ground and shot two more times, although Jessica believed that those shots had missed Demarco. Jessica later identified Williams's picture from a photo lineup.

{¶9} Tonya Warren lived across the street from where Demarco was shot. She was standing outside with a large group of children when she heard gunshots. She looked over to see a light-skinned black man wearing a bright turquoise shirt and hat

shooting at Demarco. She said that she saw fire from the muzzle of the gun as the man shot. She then saw the shooter run from the scene.

{¶10} Cincinnati police officers responded to a 911 call and found Demarco lying on the ground with wounds to his abdomen and leg. They stated that he was "scared, crying, screaming in pain." He told one of them, "please don't let me die." Demarco was taken to the hospital, where he died a short time later.

{¶11} The police recovered bullets and bullet casings from the scene and from Demarco's body. They were identified as being fired from a .9 mm Luger semiautomatic pistol, a gun that would give off an identifiable flash when fired. The police never recovered the murder weapon.

{¶12} The day after the murder, the police arrested Williams. He was housed at the Hamilton County Justice Center. Abdul McMillon, an inmate who had been Demarco's friend, testified that he had confronted Williams about Demarco's murder and that the two had fought. Later, Williams came to McMillon's cell to explain what had happened. According to McMillon, Williams had stated that "he didn't want it to happen the way that it went down, but it did." Williams told McMillon that Demarco had robbed Williams in front of Williams's son. The two had fought about the robbery the afternoon that Demarco had been killed. According to McMillon, Williams said that Demarco had taken a swing at him, and, on instinct, Williams had pulled out his gun and shot Demarco.

## II. Certificate of Nondisclosure

{¶13} In his first assignment of error, Williams contends that the trial court erred in granting the state's motion to withhold discoverable evidence from the defense until after jury selection was completed. He argues that the state did not comply with Crim.R. 16(D) and that it did not meet its burden to show reasonable, articulable

4

grounds to believe that disclosure of the witnesses' names would have compromised the witnesses' safety or subjected them to intimidation or coercion. This assignment of error is not well taken.

### A.   Crim.R. 16(D) and (F)

{¶14} We review issues relating to discovery under an abuse-of-discretion standard. *State v. Parson,* 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983); *State v. Trollinger*, 1st Dist. Hamilton No. C-110340, 2012-Ohio-6396, ¶ 7. Crim.R. 16(I) requires each party to "provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call[.]"

{¶15} But, under Crim.R. 16(D)(1), if "[t]he prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion," the prosecuting attorney shall certify to the court that he or she is not disclosing discoverable materials. *Trollinger* at ¶ 8. Reasonable, articulable grounds may include, but are not limited to, "the nature of the case, the specific course of conduct of one or more parties, threats or prior instances of witness tampering or intimidation, whether or not those instances resulted in criminal charges, whether the defendant is pro se, and any other relevant information." Crim.R. 16(D).

{¶16} In this case, the prosecuting attorney's certification stated that the prosecuting attorney sought "non-disclosure of the names and addresses of all the civilian/private witnesses in the above-captioned case. The disclosure of such information will compromise the safety of these witnesses and subject them to intimidation or coercion." It further stated that "in virtually every homicide case[,] coercion and threats to the witnesses now play a critical role. With today's broad

expansion of information via the Internet or cell phones, witnesses' names quickly spread through the communities involved."

{¶17} These generalized assertions are insufficient to meet the requirement of Crim.R. 16(D) that the prosecuting attorney must have reasonable, articulable grounds to believe that disclosure will compromise the witnesses' safety. " 'Articulable' is the key word, as it is, analogously, in *Terry* stop and frisk cases." *State v. Howard*, 2d Dist. Greene No. 2012-CA-39, 2013-Ohio-2343, ¶ 65. In this case, the prosecuting attorney provided no specific and articulable facts to justify the certification. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Luckett*, 1st Dist. Hamilton Nos. C-070539, C-070360, and C-070361, 2008-Ohio-441, ¶ 7.

{¶18} Nevertheless, the state was able to cure that defect later in the proceedings. Crim.R. 16(F) provides that "[u]pon motion of the defendant, the trial court shall review the prosecuting attorney's decision of nondisclosure * * * for abuse of discretion during an *in camera* hearing conducted seven days prior to trial, with counsel participating." The trial court held a hearing as required by the rule. As long as the reason for nondisclosure satisfies one of the factors listed in Crim.R. 16(D), an oral certification during a hearing before the parties is sufficient. *State v. Hebdon*, 12th Dist. Butler Nos. CA2012-03-052 and CA2012-03-062, 2013-Ohio-1729, ¶ 49.

{¶19} At the hearing, Detective Kurt Ballman of the Cincinnati Police Department testified that several witnesses had approached him and stated that they were afraid of being harmed by Williams, who had numerous prior offenses of violence, his family or his associates if they testified against him. They were most fearful of Williams's older brother, William Williams, known as "Bill Bill," who also had a violent criminal history. Detective Ballman further stated that "[h]is brothers and the group he runs are known for doing robberies and shooting people. Mr. Williams' [other] brother

6

was even murdered as a result of this kind of activity that they're all involved in." The witnesses had expressed to Detective Ballman their specific fear of retaliation if they testified. Thus, the state presented testimony showing that the disclosure of the witnesses' names would have compromised their safety or subjected them to intimidation or coercion as required by Crim.R. 16(D).

{¶20} Based on Detective Ballman's testimony, the court found that it "[a]ppears they're afraid, as his family's out there, apparently has a violent brother. And in order to get the witnesses to come forward the officer—to the extent he's able to—did promise that their names would not be disclosed." The trial court found no abuse of discretion by the prosecuting attorney in the nondisclosure. We cannot hold that the trial court's decision failing to order disclosure of the witnesses' names was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See State v. Clark*, 71 Ohio St.3d 466, 470, 644 N.E.2d 331 (1994).

### B. Disclosure of Favorable Evidence under Brady v. Maryland

{¶21} Williams also argues that he was denied due process because the state withheld evidence favorable to him that he needed to fully contest the eyewitness identification procedure, and to investigate any of the witnesses' biases or motives to fabricate until after the trial court had heard and denied his motion to suppress identification evidence. We find no merit in this argument.

{¶22} In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the prosecution's suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the prosecution's good or bad faith. *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph four of the syllabus; *State v. Kalejs*, 150 Ohio App.3d 465, 2002-Ohio-6657, 782 N.E.2d 112, ¶ 16 (1st Dist.).

Evidence is material if a reasonable probability exists that, had the state disclosed the evidence to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Kalejs* at ¶ 16. This rule applies to impeachment evidence, which, if disclosed by the state and used properly by the defense, may make the difference between conviction and acquittal. *Bagley* at 676; *Kalejs* at ¶ 19.

{¶23} Williams argues that one of the items withheld from him until after jury selection was a videotape showing eyewitness Tonice Thompson as she sat in the back of a police cruiser. At the hearing on Williams's motion to suppress identification evidence, Cincinnati police officer Anthony Upchurch testified that Tonice had been talking on her cell phone as she waited for the police to interview her. In the meantime, Officer Upchurch had been doing searches for possible suspects on the computer in his cruiser. Williams's picture came up, and Tonice shouted, "That's him." Williams contended that the video directly contradicted that testimony because it showed that Tonice was talking to a police detective on her cell phone and that the detective had given her Williams's name, and that Officer Upchurch had specifically showed her Williams's picture.

{¶24} Williams acknowledges that he obtained a copy of the videotape "in time for trial." The Ohio Supreme Court has stated that no *Brady* violation occurs when the evidence in question was presented to the defense during the trial. *State v. Wickline*, 50 Ohio St.3d 114, 116, 552 N.E.2d 913 (1990); *Trollinger*, 1st Dist. Hamilton No. C-110340, 2012-Ohio-6396, at ¶ 13.

{¶25} The trial court also granted Williams a three-day continuance, and Williams cross-examined the witnesses about the issue. Further, the record unequivocally shows that Tonice knew Williams, although she did not know his name.

From the beginning, she recognized the shooter from a prior incident. Therefore, the videotape was not material, and the state's failure to disclose it before trial, which would have revealed the witness's identity, did not violate Williams's due-process rights.

{¶26} Williams next argues that the state also withheld McMillon's statement to the police because he was one of the witnesses whose name was not disclosed until the day of trial. Williams attempted to get some records from the Department of Youth Services ("DYS") because McMillon had claimed that he and Williams had become friends when they had been incarcerated as juveniles. Williams wanted to show that that McMillon had lied to the police to make his testimony more credible. But he was unable to get the records between the time that McMillon's name was disclosed and when McMillon testified at trial.

{¶27} Nevertheless, while Williams could not obtain the records he sought, he had McMillon's statement by the time of trial. He attacked McMillon's credibility on cross-examination even without the evidence he was unable to obtain. Williams has not shown that had he obtained the DYS records he had sought, a reasonable probability existed that the result of the trial would have been different. Therefore, he has not demonstrated that the additional evidence he sought to obtain was material. *Trollinger*, 1st Dist. Hamilton No. C-110340, 2012-Ohio-6396, at ¶ 14; *Kalejs*, 150 Ohio App.3d 465, 2002-Ohio-6657, 782 N.E.2d 112, at ¶ 16.

### C. Ineffective Assistance of Counsel

{¶28} Finally, Williams argues that he was denied the effective assistance of counsel when the state withheld evidence vital to the preparation of an effective defense until the trial began. Again, the court granted Williams a three-day continuance after the state had disclosed the names of the witnesses. Counsel was able to investigate and provide Williams with a diligent and thorough defense. Williams has not demonstrated

that his counsel's representation fell below an objective standard of reasonableness or that, but for counsel's lack of investigation or preparation, the result of the proceeding would have been otherwise. Therefore, he has failed to meet his burden to show ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687-689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 50-52. Consequently, we overrule Williams's first assignment of error.

### *III. Identification Evidence*

{¶29} In his second assignment of error, Williams contends that the trial court erred in overruling his motion to suppress identification evidence. He argues that the identification procedures were so unduly suggestive that the identifications were not reliable. This assignment of error is not well taken.

{¶30} Generally, a trial court must suppress a pretrial identification of a suspect if (1) the confrontation was unnecessarily suggestive of the suspect's guilt and (2) the identification was unreliable under the circumstances. *State v. Waddy*, 63 Ohio St.3d 424, 438, 488 N.E.2d 819 (1992); *State v. Ojile*, 1st Dist. Hamilton Nos. C-110677 and C-110678, 2012-Ohio-6015, ¶ 75. The defendant bears the burden of proving both prongs of the test. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Ojile* at ¶ 75. Suggestive identification procedures are unreliable if they create a substantial likelihood of misidentification. *Waddy* at 439; *Ojile* at ¶ 75.

{¶31} Williams argues that Tonice's identification of him as the shooter was the result of a suggestive procedure. He states that "[i]t is difficult to imagine anything more 'suggestive' than police officers telling a witness the name of their suspect and showing her a mug shot on a police terminal." But, this court has stated that "[t]he most overtly suggestive process might not be grounds for suppression where the witness had more

10

than ample opportunity to view the suspect, or perhaps already knew the suspect, * * * and was certain in her or her identification." *State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 21, citing *Waddy* at 439.

{¶32} Here, Tonice stood within six or seven feet of Williams when he shot Demarco in the middle of the day. She knew Williams from a prior incident and recognized him at the time of the shooting, although she did not know his name. Although at first she denied seeing the shooting out of fear, she eventually decided to cooperate with the police. When police showed her the picture of Williams, she recognized him immediately as the man who had shot Demarco. Under the circumstances, there was no substantial likelihood of misidentification, and her identification was reliable. *See State v. Levingston*, 1st Dist. Hamilton No. C-090235, 2011-Ohio-1665, ¶ 8-10.

{¶33} Further, several other witnesses also identified Williams, whom they knew as "Network," as being on the scene at the time of the shooting. Tonice's sister Jessica, another eyewitness to the crime, testified to the same version of events as Tonice. She also knew Williams as "Network," and identified "Network" as the shooter. Therefore, even if the trial court had erred in allowing Tonice's identification into evidence, any error was harmless. *See State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976), paragraph seven of the syllabus, *vacated as to death penalty*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978); *State v. Williams*, 1st Dist. Hamilton Nos. C-060631 and C-060668, 2007-Ohio-5577, ¶ 39. We overrule Williams's second assignment of error.

### IV. Batson Challenges

{¶34} In his third assignment of error, Williams contends that the trial court erred when it overruled his objections to the state's use of peremptory challenges to

exclude African-American jurors. He argues that the state's use of those challenges without a valid race-neutral reason violated his right to equal protection. This assignment of error is not well taken.

{¶35} In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of peremptory challenges so as to exclude members of minority groups from petit juries. *State v. O'Neal*, 87 Ohio St.3d 402, 402, 721 N.E.2d 73 (2000); *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 14. *Batson* established a three-step procedure for evaluating claims of racial discrimination in the use of peremptory challenges. *State v. White*, 85 Ohio St.3d 433, 435, 709 N.E.2d 140 (1999); *Thomas* at ¶ 14.

{¶36} First, the opponent of a peremptory strike must make a prima facie showing of discrimination. Second, the proponent of the strike must give a race-neutral explanation for the strike. *State v. Herring*, 94 Ohio St.3d 246, 255-256, 762 N.E.2d 940 (2002); *Thomas* at ¶ 15. The state's reason is deemed to be race-neutral unless discriminatory intent is inherent in the explanation. *Thomas* at ¶ 15. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful discrimination. *Herring* at 256; *Thomas* at ¶ 16.

{¶37} The burden of persuasion always stays with the opponent of the strike. A reviewing court will defer to the trial court's finding that no discriminatory intent existed since it turns largely on an evaluation of credibility. *Herring* at 256; *Thomas* at ¶ 16. The reviewing court may only reverse a trial court's finding if that finding is "clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Thomas* at ¶ 16.

12

{¶38} Williams argues that the state used four of its peremptory challenges against African-Americans, even though they formed a small percentage of the venire. Consequently, the trial court erred in failing to make a finding that he had established a prima facie case of discrimination. But the Ohio Supreme Court has held that once a prosecutor has offered a race-neutral explanation for a peremptory challenge and the court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing of discrimination becomes moot. *State v. Hernandez*, 63 Ohio St.3d 577, 583, 589 N.E.2d 1310 (1992).

{¶39} Williams also argues that the trial court did not adequately assess the explanations offered by the state to determine whether or not a discriminatory purpose was established. This argument is without merit.

{¶40} The record shows that the state used a peremptory challenge on juror number 5 because he had a prior assault conviction, a prior gun charge, family members with trafficking convictions, and familiarity with Winton Terrace. The prosecutor also felt that his demeanor and body language showed that he could not be fair and impartial. Body language and demeanor are permissible race-neutral justifications for exercising a peremptory challenge. *State v. Brown*, 8th Dist. Cuyahoga No. 84059, 2004-Ohio-6862.

{¶41} The state used a peremptory challenge on juror number 6 because she knew one of the witnesses who had been a client of hers with whom she had worked closely. She also said on her juror questionnaire that she did not think that she would be a good juror because her job "clouded her judgment of people."

{¶42} The state used a peremptory challenge against juror number 9 because of inconsistent or incomplete answers on the jury questionnaire. He had stated on the questionnaire that neither he nor a family member had been convicted of a crime.

But he later stated that he had been convicted of arson and his son had recently been convicted of attempted murder. He also indicated that his brother had been the victim of a shooting, so the prosecutor had concerns about whether he could be fair and impartial since the charges against Williams involved a shooting.

{¶43} Finally, the state used a peremptory challenge against juror number 17. That juror had also stated in the jury questionnaire that neither he nor a family member had ever been convicted of a crime. But it was revealed during voir dire that he had been convicted of contributing to the delinquency of a minor, and that his stepson was incarcerated on a manslaughter charge. The prosecutor also felt that juror 17 was evasive in answering questions, and the prosecutor was concerned that he had stated during questioning that he did not believe in judging people, which was "exactly what the State [was] going to ask all of these jurors to do."

{¶44} Thus, the prosecutor provided race-neutral reasons for the use of the challenges. The explanation need not rise to the level justifying the exercise of a challenge for cause. *O'Neal*, 87 Ohio St.3d at 409, 721 N.E.2d 73; *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 18. The trial court's acceptance of these race-neutral reasons was not clearly erroneous. Williams has not met his burden to show discriminatory intent, and we, therefore, overrule his third assignment of error.

### *V. Mistrial*

{¶45} In his fourth assignment of error, Williams contends that the trial court erred in overruling his motion for a mistrial. He argues that the prosecutor's repeated conduct during closing argument, the failure to disclose favorable and relevant evidence, and the deliberate use of peremptory challenges to exclude African-American jurors all combined to deny him his right to due process. This assignment of error is not well taken.

14

{¶46} The decision whether to grant a mistrial lies within the trial court's discretion. A trial court should not order a mistrial merely because an error or irregularity occurred, unless it affects the defendant's substantial rights. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987); *State v. Brown*, 1st Dist. Hamilton No. C-120327, 2013-Ohio-2720, ¶ 32. The court should declare a mistrial "only when the ends of justice so require and when a fair trial is no longer possible." *Brown* at ¶ 32.

{¶47} We have already rejected most of the arguments Williams raises in this assignment of error. He also argues that the prosecutor made improper comments during closing argument. But most of the comments about which he complains were fair comments on the evidence. But even if they were not, Williams has not shown that they denied him a fair trial. *See State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993); *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 37-38. Under the circumstances, we cannot hold that the trial court's decision to overrule Williams's motion for a mistrial was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See Clark*, 71 Ohio St.3d at 470, 644 N.E.2d 331; *Brown* at ¶ 42. We, therefore, overrule Williams's fourth assignment of error.

### VI.  Weight and Sufficiency

{¶48} In his fifth assignment of error, Williams contends that that the state's evidence was insufficient to support his convictions. He also argues that the trial court erred in overruling his Crim.R. 29 motions for judgments of acquittal, which is the same as a claim that the evidence was insufficient to support the convictions. *See State v. Brewster*, 1st Dist. Hamilton Nos. C-030024 and C-030025, 2004-Ohio-2993, ¶ 73. This assignment of error is not well taken.

{¶49} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that

the state proved beyond a reasonable doubt all of the elements of murder under R.C. 2903.02(A), along with the accompanying specifications, and having weapons while under a disability under R.C. 2923.13(A)(2). Therefore, the evidence was sufficient to support the convictions. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Ojile*, 1st Dist. Hamilton Nos. C-110677 and C-110678, 2012-Ohio-6015, at ¶ 48.

{¶50} Williams argues that no "forensic evidence supports the state's theory of the offense." But no rule of law exists that a witness's testimony must be corroborated by physical evidence. *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 45. He also argues that the state's evidence was not credible. But in deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses. *Id.*

{¶51} Williams also argues that his convictions were against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse Williams's convictions and order a new trial. Therefore, the convictions were not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.3d 541 (1997); *State v. Blair*, 1st Dist. Hamilton Nos. C-100150 and C-100151, 2010-Ohio-6310, ¶ 24. Consequently, we overrule Williams's fifth assignment of error and affirm his convictions.

Judgment affirmed.

**HENDON, P.J.,** and **DEWINE, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

16