[Cite as *State v. Brown*, 2013-Ohio-2720.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                        |   |                                          |
|------------------------|---|------------------------------------------|
| STATE OF OHIO,         | : | APPEAL NO. C-120327                      |
|                        |   | TRIAL NO. B-1102585                      |
|    Plaintiff-Appellee, | : |                          |
|                        |   | *O P I N I O N.*                         |
| vs.                    | : |                                          |
|                        |   |                                          |
| JOHN BROWN,            | : |                                          |
|                        |   |                                          |
|    Defendant-Appellant. | : |                          |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 28, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Farrish Law Firm* and *Michaela M. Stagnaro*, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1}     Defendant-appellant John Brown appeals a conviction for having weapons while under a disability under R.C. 2923.13(A)(2).  We find no merit in his five assignments of error, and we affirm the trial court's judgment.

## I.     Factual Background

{¶2}     Evidence presented at a jury trial showed that on April 20, 2011, at 10:15 a.m., Cincinnati police officers were dispatched to the areas of 1704 Vine Street and 1654 Hamer Street after receiving multiple reports of gunshots.  At about the same time, Andre Taylor, a local marijuana dealer, was at the corner of Hamer and Back Streets, when he saw a crowd gathering.  He observed Brown running down the steps of a building carrying "some kind of a long gun, a rifle or something."  He described Brown as being dressed in boxer shorts and a tank top.  Taylor then left the area.  He heard gunshots three to four minutes later.

{¶3}     Officer Thomas Haas responded to the scene.  He saw an individual who was later identified as Ricardo Burgin, enter and then exit the building at 1704 Vine Street.  The residents of the building admitted police officers, including Officer Haas, to search for shooting victims.  Officer Haas found Burgin sitting on a couch in apartment 1.  He called out for anyone else inside to identify themselves, and Brown appeared from a bedroom down the hall, clad only in his underwear and holding a baby.

{¶4}     Brown stated that he had been asleep, but he did not appear to be groggy.  He also stated that he did not live at that address, but that he lived at 1654 Hamer Street.  In the bedroom from which Brown had come, police found a loaded

magazine for a .9 mm semiautomatic weapon in a pile of clothing that was still warm. Hanging in the closet was a coat with a handgun in the pocket.

{¶5}    Police then responded to the area of 1654 Hamer Street, where Brown had said that he lived, and found close to 50 shell casings from three different caliber firearms on the ground.  They also noticed a yellow Camaro that Brown was known to drive parked in front of 1654 Hamer Street.  The Camaro was titled in the name of Kaeshia Varner, who lived at 1654 Hamer Street.  Police entered the apartments at that address to look for shooting victims, but found none.

{¶6}    Subsequently, the police obtained a search warrant for 1654 Hamer Street.  They recovered a loaded .38 special Taurus revolver with a mixture of DNA on it that included Brown's, as well as a gun case and gun magazines.  The police also recovered several documents bearing Brown's name, including notices to appear in court, traffic tickets, a license forfeiture form, and a parole officer's business card. Gunshot residue was recovered from both of Brown's hands.  Brown was under a disability because of a previous conviction for felonious assault and could not knowingly possess a firearm.

{¶7}    Cincinnati Police Officer Rick Malone interviewed Brown after his arrest.  Though it was Malone's custom to record interviews, Brown stated that he preferred not to be recorded, and Malone honored his request.  According to Malone, Brown stated that he had spent the night before his arrest with "Kiki" at 1704 Vine Street, as he did two or three times per week.  He denied living at 1654 Hamer Street, instead insisting that he lived with his grandmother at 6314 Elmview Place.  He was also adamant that he had never even been in any building on Hamer Street, although police officers had seen Brown on that street and entering the building at 1654

Hamer Street on several occasions. Brown also said that he had not handled any guns or ammunition that day.

## II. Standing to Challenge the Search of Varner's Apartment

{¶8} In his first assignment of error, Brown contends that the trial court erred in overruling his motion to suppress evidence obtained as a result of the search of Varner's apartment at 1654 Hamer Street. He argues that the trial court improperly found that he did not have standing to challenge the search. This assignment of error is not well taken.

{¶9} Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Ojile*, 1st Dist. Nos. C-110677 and C-100678, 2012-Ohio-6015, ¶ 61.

{¶10} Fourth Amendment rights are personal rights that may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his *Fourth Amendment* rights infringed." (Emphasis sic.) *Id.* at 134. The exclusionary rule is "an attempt to effectuate the guarantees of the *Fourth Amendment*," and only defendants whose Fourth Amendment rights have been violated may benefit from its protections. (Emphasis sic.) *Id.*

{¶11} Standing to claim the protection of the Fourth Amendment depends on whether the person involved has a legitimate expectation of privacy in the invaded

4

place. A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. *Minnesota v. Olson*, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *State v. Williams*, 73 Ohio St.3d 153, 166, 652 N.E.2d 721 (1995). The defendant bears the burden to prove that he had a reasonable expectation of privacy in the searched area. *Rakas* at 131; *Williams* at 166.

{¶12} The United States Supreme Court has recognized that an overnight guest in a home has an expectation of privacy that society is prepared to recognize as reasonable. *Olson* at 98; *Williams* at 166. But in *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the court stated that "an overnight guest in a home may claim the protection of the *Fourth Amendment*, but one who is merely present with the consent of the householder may not." (Emphasis sic.)

{¶13} Brown testified at the hearing on the motion to suppress. He stated that he was intimate with Varner and occasionally spent the night at her apartment at 1654 Hamer Street. He stated that he had stayed overnight only a few times in March and April 2011. He added that he had probably visited her on April 16, 2011, four days before the search, and that on that occasion, he had there for "some hours." He stated that he did not keep any clothing or personal items at her apartment, and that he had not been present the day of or the night before the search.

{¶14} The facts in this case lie somewhere between that of the overnight guest, who does have standing to challenge a search, and the individual merely on the premises with the owner's consent, who does not. But given the evidence before the trial court at the hearing on the motion to suppress, which showed that Brown had only stayed at the apartment sporadically, we hold that Brown did not show that he had a reasonable expectation of privacy in the residence. Consequently, the trial

court did not err in finding that Brown did not have standing to challenge the search. We overrule his first assignment of error.

### III. Evidentiary Issues

{¶15}    In his second assignment of error, Brown contends that the trial court erred in allowing the state to introduce into evidence unauthenticated hearsay statements.  He argues that the state failed to adequately authenticate the voices on audio recordings of telephone calls Brown allegedly made while in jail, and that statements made by the voices on the tapes were hearsay.  He further argues that the trial court should not have allowed Taylor to testify regarding threats made to him concerning his trial testimony.  This assignment of error is not well taken.

### A. Authentication of Recorded Telephone Calls

{¶16}    "The requirement of identification or authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Evid.R. 901(A).  This burden is not great, and only requires a prima facie showing through direct or circumstantial evidence.  *State v. Huge*, 1st Dist. No. C-120388, 2013-Ohio-2160, ¶ 27; *State v. Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937, 964 N.E.2d 12, ¶ 25 (4th Dist.).  The proponent can meet this burden by demonstrating a reasonable likelihood that the evidence is authentic.  *Huge* at ¶ 27.

{¶17}    To be admissible, a sound recording of a telephone call must be "authentic, accurate, and trustworthy."  *Tyler* at ¶ 26, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 109.  Evid.R. 901 provides for two theories upon which a trial court might admit a sound recording.  *Tyler* at ¶ 26.  First, Evid.R. 901(B)(5) allows for authentication by voice identification "whether heard firsthand or through mechanical or electronic transmission or recording,

by opinion based upon hearing the voice at any time under circumstances connecting it with the speaker." Second, under Evid.R. 901(B)(9), a sound recording may be authenticated through evidence "describing a process or system used to produce a result and showing that the process or system produces an accurate result."

{¶18} The record shows that Brown was temporarily housed in the Butler County Jail, where he made telephone calls. Ted Weichman of Combined Public Communications, which provides inmate telephone services at the Butler County Jail, testified that all calls made by inmates are recorded and stored. He stated that he transfers the calls to a CD when law enforcement officials request copies of the recordings. He identified the CD that he had made of Brown's telephone calls, which he had made upon Detective David Gregory's request. The CD listed telephone numbers with destinations and dates and times.

{¶19} Erik Wolfe of Globel Tel Link, which runs the inmate telephone system in the Hamilton County Justice Center, testified about a similar procedure. He identified a CD of Brown's telephone calls that he had made upon police request. He also identified two files, which contained telephone calls to which he had listened. The calls from both CD's were eventually combined on one CD by agreement of the parties.

{¶20} Detective Gregory identified the CD with the combined calls. He testified that intelligence officers had listened to every call that Brown had made, and that he had personally reviewed 75 to 80 of Brown's calls. He stated that he had spoken to Brown only briefly on a prior occasion and that he could not recognize his voice from that occasion. But he did become familiar with Brown's voice from listening to the recorded telephone conversations.

{¶21}   Detective Gregory further testified that the contents of the calls identified Brown because Brown had referred to himself and other people had referred to him.   In fact, most of telephone numbers that were provided to the inmate phone companies for compilation came from Brown himself when he was involved in three-way calls and had directed others to call certain numbers.

{¶22}   Consequently, the state presented sufficient circumstantial evidence to establish a reasonable likelihood that the recordings on the CD were authentic. The state was not required "to prove beyond any doubt that the evidence is what it purports to be."  *State v. Thompson*, 8th Dist. No. 96929, 2012-Ohio-921, ¶ 29, quoting *State v. Moshos*, 12th Dist. No. CA2009-06-008, 2010-Ohio-735, ¶ 12. In ruling on Brown's objection to the admission of the CD into evidence, the trial court incorrectly stated that Gregory had said that he talked to Brown on one occasion and could recognize his voice.  To the contrary, Gregory had stated that he could not recognize Brown's voice from that one conversation, but from the calls themselves. Nevertheless, Gregory's testimony that he recognized Brown's voice from the recordings and that the contents of the calls identified Brown's voice, together with testimony about how the phone calls were compiled, was sufficient to meet the low threshold for authentication.  *See Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937, 964 N.E.2d 12, at ¶ 27 and 33.  Whether the voice on the recordings was in fact Brown's was a question for the trier of fact to decide.  *See Thompson* at ¶ 32.

### B.   Hearsay/Appellate Review

{¶23}   Brown argues that the telephone recordings contained hearsay.  He makes the bald assertion that "[e]ven if the Court finds that the calls were authenticated, the other voices and statements contained on the calls were hearsay and should have been excluded[,]" with only a general citation to Evid.R. 801(A) and

8

(C). He does not specify which statements out of the numerous statements in the recordings are hearsay.

{¶24} The appellant bears the burden to show error by reference to the record. To be considered on appeal, errors by a trial court must be argued and supported by legal authority and citation to the record. App.R. 16(A); *State v. Rucker*, 1st Dist. No. C-110082, 2012-Ohio-185, ¶ 32. "If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *State v. Dutiel*, 5th Dist. No. 2012-CA-11, 2012-Ohio-5349, ¶ 38, quoting *Thomas v. Harmon*, 4th Dist. No. 08CA17, 2009-Ohio-3299, ¶ 14. We decline to go through every statement on the recordings and decide which of them are hearsay.

{¶25} Generally, though, a statement is not hearsay if it is not offered into evidence to prove the truth of the matter asserted. Evid.R. 801(C). For the most part, the prosecution did not offer the statements of the other people on the recordings for their truth, but to provide context for Brown's statements. Therefore, for the most part, they were not hearsay. *See State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980); *State v. Brewster*, 1st Dist. Nos. C-030024 and C-030025, 2004-Ohio-2993, ¶ 50.

### C. Other-Acts Evidence

{¶26} Next, Brown argues that the recorded telephone conversations contain other-acts evidence that the state presented for the sole purpose of showing Brown's bad character. Generally, the prosecution in a criminal case may not present evidence that a defendant has committed other crimes or acts independent of the crime for which the defendant is being tried to establish that the defendant acted in conformity with his bad character. Evid.R. 404(B); *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 37 (1st Dist.). But Evid.R.

9

404(B) provides that other bad acts are admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Shedrick*, 61 Ohio St.3d 331, 337, 574 N.E.2d 1065 (1991); *Lukacs* at ¶ 37.

{¶27}   Again, Brown does not specify the other-acts evidence to which he objects.  In some of the calls, he is trying to recruit others to come and testify that the gun had been in their possession, not Brown's.  Certainly, such attempts to subvert the state's case demonstrate knowledge or absence of mistake or accident.  Evidence relating to "attempts at suppression of adverse evidence reflects a consciousness of guilt and is not 'wholly independent' of the charged offenses."  *State v. Hirsch*, 129 Ohio App.3d 294, 306-307, 717 N.E.2d 789 (1st Dist.1998).

{¶28}   In the trial court, Brown had argued that comments he had made in the telephone conversations about "two bangers" and a ".40" were inadmissible other-acts evidence.  But Brown was charged with possessing a .40-caliber firearm while under a disability.  He was also charged with possessing a second firearm, accounting for his reference to two "bangers."  The case against Brown for the .40-caliber weapon was dismissed after the jury failed to reach a verdict.  He was convicted on the charge related to the other firearm.  Thus, the references to the "bangers" and the ".40" refer to the charges for which he was being tried, not to other acts.  Therefore, Evid.R. 404(B) did not apply to them.

### D.   Alleged Threats to a Witness

{¶29}   Finally, Brown argues that the trial court erred in allowing Taylor to testify to threats allegedly made to him by others concerning his trial testimony because those threats were prejudicial hearsay.  This court has held that references to attempts at witness intimidation "can serve to explain why witnesses have not

immediately come forward to the police with information[.]" *State v. Lewis*, 1st Dist. Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 23.

{¶30} In this case, Taylor had not come forward on his own to speak to police. He only appeared in court at the urging of the police. After learning that the state's witness list contained Taylor's name, Brown telephoned several people from jail and asked them to find Taylor. Evidence that Taylor and his family were threatened was relevant to show why he had not come forward, and it also helped to rebut attacks on his credibility. *See Lewis* at ¶ 23-25; *State v. Grimes*, 1st Dist. No. C-030922, 2005-Ohio-203, ¶ 55-58. Consequently, we overrule Brown's second assignment of error.

### IV. Denial of Brown's Motion for a Mistrial

{¶31} In his third assignment of error, Brown contends that the trial court erred by overruling his motion for a mistrial. He argues that the trial court improperly: (1) allowed Detective Gregory to testify about Brown being in prison; (2) allowed Taylor to testify about being threatened prior to trial; and (3) allowed the trial to continue after people from the gallery attempted to intimidate the jury members and created prejudice with their behavior. The cumulative effect of these errors, he contends, denied him a fair trial. This assignment of error is not well taken.

{¶32} The decision whether to grant a mistrial lies within the trial court's discretion. A trial court should not order a mistrial merely because an error or irregularity has occurred, unless it affects the defendant's substantial rights. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987); *State v. Jones*, 1st Dist. No. C-080518, 2009-Ohio-4190, ¶ 26. The court should declare a mistrial "only when the ends of justice so require and when a fair trial is no longer possible." *Brewster*,

2004-Ohio-2993, at ¶ 67, quoting *State v. Broe*, 1st Dist. No. C-020521, 2003-Ohio-3054, ¶ 36.

{¶33} We have already held that the trial court did not err in allowing Taylor to testify regarding threats made to him and we need not revisit that issue. Additionally, Brown's motion for a mistrial did not relate to that testimony.

### A. Reference to Brown Having Been in Prison

{¶34} The record shows that when Detective Gregory was testifying about the phone calls that Brown had made from jail, he misspoke and used the word "prison." In ruling on Brown's subsequent motion for a mistrial, the trial court stated, "There have been multiple occasions where Counsel has cross-examined about a parole hearing, so the jury is well aware he is on parole." The court went on to state that "[a]nd if they understand anything about the judicial system, you only get on parole after serving time in prison." Therefore, the court concluded, Brown had not been prejudiced. We cannot hold that the trial court's decision was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See State v. Clark*, 71 Ohio St.3d 466, 470, 644 N.E.2d 331 (1994); *Jones*, 2009-Ohio-4190, at ¶ 30.

{¶35} Further, despite its conclusion that Brown was not prejudiced, the court told the jury to disregard the statement about Brown being in prison. We presume that the jury followed that instruction. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995); *Jones*, 2009-Ohio-4190, at ¶ 33.

### B. Outside Communication with the Jury

{¶36} Finally, Brown argues that he was denied a fair trial because the court allowed the trial to continue after members of the gallery attempted to intimidate the members of the jury. "When a trial court learns of an improper outside

communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *State v. Johnson*, 88 Ohio St.3d 95, 107, 723 N.E.2d 1054 (2000), quoting *State v. Phillips*, 74 Ohio St.3d 72, 88-89, 656 N.E.2d 643 (1995). In cases involving outside influences on jurors, trial courts have broad discretion in determining whether to declare a mistrial or replace an affected juror. *State v. Stallings*, 89 Ohio St.3d 280, 296, 731 N.E.2d 159 (2000). The defendant must prove that a juror has been biased. *Johnson* at 107.

{¶37} The record shows that during deliberations, the jury foreperson informed the court's bailiff that people they associated with the defendant had been congregating in the hallway and near the door and had been attempting to interact with the jurors as they were leaving. The following morning, the court notified counsel and asked the bailiff to explain what had happened.

{¶38} With the agreement of the parties, the court spoke separately with four jurors. They described incidences of what they felt were attempts to intimidate them, but they denied feeling intimidated. One juror reported that a person had asked her about deliberations while she had been in the restroom. All four jurors indicated that that they could disregard what had happened and that they could be fair to both sides during deliberations.

{¶39} The court stated that it was not going to speak to all of the jurors together, stating "I will take your guidance on that, but I think less, the better, as opposed to making it a bigger situation than it is." Brown's counsel agreed, stating, "I am going to assume that the jurors that went back are going to discuss that they feel assured that when they leave next time it's going to be fine."

{¶40} But after an off-the-record discussion, Brown's counsel moved for a mistrial. She stated, "I think some spectators in the gallery are creating some

13

prejudice against him with the jury through no fault of his own. I am concerned about these jurors imputing the actions of friends and family members to him."

{¶41} The trial court denied the motion, stating that it had talked with the four jurors individually, and that "each assured they can set this aside and decide this case on the merits of the case and not consider or factor in what may have happened outside of the courtroom and they can be fair to both the State and to the Defendant." The court also asked for more security in the courtroom and sternly warned the members of the public in the courtroom against any more attempts to contact the jury.

{¶42} Brown has not demonstrated that the trial court abused its discretion. He spoke to the individual jurors, who all stated unequivocally that they could disregard the attempts at outside communication and deliberate fairly and impartially. "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *Stallings*, 89 Ohio St.3d at 297, 731 N.E.2d 159, quoting *Phillips*, 74 Ohio St.3d at 89, 656 N.E.2d 643. Further, the court took additional steps to make the jurors feel more secure and to ensure that no more improper communication occurred. Under the circumstances, we cannot hold that the trial court's decision to overrule Brown's motion for a mistrial was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See Clark*, 71 Ohio St.3d at 470, 644 N.E.2d 331. We, therefore, overrule Brown's third assignment of error.

### V.   *Weight and Sufficiency*

{¶43} In his fourth assignment of error, Brown contends that the evidence was insufficient to support his conviction. The state presented evidence supporting the inference that Brown had exercised dominion and control over the premises

where the firearm was found and that he was aware that it was on the premises. Therefore, the state's evidence showed that Brown had constructive possession of the firearm. *See State v. Jackson*, 1st Dist. No. C-110570, 2012-Ohio-2727, ¶ 14; *State v. Thomas*, 1st Dist. No. C-020282, 2003-Ohio-1185, ¶ 9.

{¶44} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state had proved beyond a reasonable doubt all of the elements of having a weapon under a disability under R.C. 2923.13(A)(2). Therefore, the evidence was sufficient to support his conviction. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Erkins*, 1st Dist. No. C-110675, 2012-Ohio-5372, ¶ 69.

{¶45} Brown also contends that his conviction was against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse Brown's conviction and order a new trial. Therefore, the conviction was not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Erkins* at ¶ 72. We overrule Brown's fourth assignment of error.

### *VI. Sentencing*

{¶46} In his fifth assignment of error, Brown contends that he was improperly sentenced. He argues that the trial court did not state on the record that it had considered the purposes and principles of sentencing or any of the factors set forth in R.C. 2929.11 and R.C. 2929.12 before imposing the maximum sentence. But these statutes are not fact-finding statutes. They require only that the court consider the specified factors. We can presume from a silent record that the trial court

considered the factors unless the defendant affirmatively demonstrates that the court has failed to do so. *State v. Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 24. Brown has not shown that the trial court failed to consider the statutory factors.

{¶47} Our review of the record shows that the sentence was not contrary to law, or so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. Therefore, the trial court did not err in imposing the sentence. *See State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 14-17; *Alexander* at ¶ 9 and 27.

{¶48} Finally, Brown argues that the trial court failed to grant him 165 days of jail-time credit toward his sentence for a postrelease-control violation under R.C. 2967.191. But that issue should be raised in the separate case that involves the parole violation, which is not being appealed here. That issue is not properly before us. Brown was granted all credit he was entitled to in this case. Consequently, we overrule his fifth assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**HILDEBRANDT, P.J.,** and **FISCHER, J.,** concur.

Please note:

The court has recorded its own entry this date.