**[Cite as *State v. Keese*, 2024-Ohio-5075.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240020 |
| | | TRIAL NO. B-2105883-B |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| BRYANT KEESE, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:   Affirmed in Part, Reversed in Part, and Cause
                            Remanded

Date of Judgment Entry on Appeal: October 23, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill*, *Jr.*,
Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1}    Defendant-appellant Bryant Keese appeals his convictions following a jury trial for various drugs and weapons offenses.  More specifically, Keese challenges the trial court's decision denying his motion to suppress evidence seized by police following a suspected drug transaction, as well as evidence taken from an apartment belonging to his girlfriend after police executed a search warrant.  Keese also raises as error the trial court's imposition of separate prison terms for two counts of trafficking. Finally, Keese asserts that he received ineffective assistance of counsel at trial.

{¶2}    We agree with Keese that the trial court should have merged the trafficking counts for sentencing and sustain his assignment of error in that regard. But, having considered the totality of the circumstances surrounding both the search of his person and the search warrant affidavit for his girlfriend's apartment, we find no constitutional error in the trial court's denial of Keese's motion to suppress.  We accordingly affirm the trial court's judgment in part, reverse it in part, as to the sentences imposed on Counts 4 and 5, and remand the matter for the limited purpose of resentencing Keese on those counts.

### *Factual and Procedural Background*

{¶3}    On November 17, 2021, Keese was arrested after an encounter with police outside of his girlfriend's apartment building.  Seven days later, he was charged in a nine-count indictment with: (1) Counts 1 and 2, possession of a fentanyl-related compound in violation of R.C. 2925.11(A), both felonies of the second degree; (2) Count 3, possession of cocaine in violation of R.C. 2925.11(A), a felony of the first degree; (3) Counts 4 and 5, trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2), both felonies of the second degree; (4) Count 6, trafficking in

cocaine in violation of R.C. 2925.03(A)(2), a felony of the first degree; (5) Count 7, carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a felony of the fourth degree; (6) Count 8, having a weapon while under disability in violation of R.C. 2923.13(A)(3), both felonies of the third degree; and (7) Count 9, one count of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16(B), a felony of the fourth degree.

{¶4} On February 12, 2023, Keese filed a motion to suppress. The motion sought to exclude all evidence found on Keese's person, in his vehicle, and in Apartment 6, a residence belonging to his girlfriend that was searched the day Keese was arrested.

{¶5} On March 10, 2023, the trial court conducted an evidentiary hearing on Keese's motion to suppress. At the hearing, Keese testified as to his standing to challenge the search of the apartment. To that end, Keese testified that his girlfriend lived in Apartment 6 in the Clifton neighborhood of Cincinnati and that he had spent the two days leading up to his arrest with her there. While Keese admitted that his actual residence was with his uncle in Madisonville, Keese explained that he spent the night with his girlfriend at Apartment 6 approximately two to three times a week, particularly when his uncle had romantic visitors over to the Madisonville residence. Keese further stated that he kept personal items and clothing at his girlfriend's apartment and had a key to let himself in. He testified that he had spent the night at Apartment 6 the night before his arrest.

{¶6} The State then called Officer Kevin Broering, an undercover officer assigned to Cincinnati Police Department's ("CPD") Crime Gun Intelligence Unit. Broering testified that on November 17, 2021, he conducted covert surveillance at a

residential building containing Apartment 6. The target of the operation was an unrelated individual, not Keese or his girlfriend, who had outstanding felony warrants and had previously fled from the police. As Broering explained, while conducting surveillance for this person, he witnessed Keese drive a black Infiniti and pull into a parking spot at the apartment building. Broering ran the plates of the Infiniti and determined that it belonged to Keese.

{¶7} Broering testified that he witnessed an unknown person walk up to Keese's vehicle with money in his hand, approach the window, and walk away with a plastic bag that Broering believed contained drugs. Following the transaction, Broering observed Keese pull out of the parking spot, drive around the building, and park again in the same parking spot. After witnessing these events, Broering radioed for additional officers. Broering then saw Keese's girlfriend get out of the Infiniti with groceries in her hand, but she was detained by officers who had arrived on the scene, as was Keese when he got out of the car.

{¶8} Broering testified that when Keese was detained, he told the police he was in possession of a weapon. As a result, Keese was patted down, and a gun was found on his person. Broering also testified that Keese was in possession of a key to Apartment 6 and that a black sock containing fentanyl, cocaine, and a digital scale was found under the driver's seat of the Infiniti. Keese and his girlfriend were taken into custody.

{¶9} Broering added that after Keese and his girlfriend were arrested, Keese made a statement that he would confess to possessing whatever contraband was found in the apartment. Broering learned this information from a fellow officer.

{¶10} According to Broering, based on information gathered from the scene, he obtained a search warrant to search Apartment 6. As Broering explained, officers conducting the search uncovered additional quantities of drugs from various locations in the apartment.

{¶11} On October 13, 2023, the trial court denied Keese's motion to suppress in a written entry. Before that, it made specific findings on the record in support of its ruling. With regard to the basis to stop Keese when he got out of his car, the trial court found that Broering's observation of a hand-to-hand transaction created probable cause for an arrest. With regard to Keese's standing to challenge the search warrant for Apartment 6, the trial court found that:

> the defendant did have keys but stayed there irregularly. Some of his mail and the keys is not enough and does not convince the Court that the defendant did have standing to object. However, even if it's found that he had standing to object, the Court nevertheless finds that there was enough probable cause not only to search the person but also the property.

{¶12} Keese's jury trial began on October 16, 2023. At trial, the State called six witnesses: (1) Officer Mark Bode; (2) Officer Orkies; (3) Officer Taylor Howard; (4) Laura Kimble; (5) Douglass Wimsatt; and (6) Broering.

{¶13} Bode, a CPD officer assigned to the Crime Gun Intelligence Center ("CGIC"), was working undercover near Apartment 6 on the day of the incident. As he explained in his testimony, he witnessed an unidentified male exit from a vehicle containing out-of-state plates and walk to Keese's vehicle, where Keese and the person made a quick exchange before the male walked back to his vehicle and left. Bode

testified that Keese then pulled out of his parking spot, and Bode followed. According to Bode, he stopped following Keese once he saw other uniformed officers enter the apartment complex. Bode identified Keese in the courtroom as the person he saw in the vehicle in the parking lot.

{¶14} Broering testified that, on the day of the incident, he observed what he believed to be a drug transaction take place between Keese and an unknown individual. After observing this transaction, he radioed for uniformed officers. Broering testified to overhearing Keese tell officers that he did not live at his girlfriend's apartment, but instead lived in Madisonville. Broering admitted, however, that he had seen Keese at the apartment several times while conducting surveillance of the apartments.

{¶15} Broering further explained that he obtained a search warrant for Apartment 6 based on information obtained at the scene, and that officers then conducted a search of the residence. According to Broering, police recovered a Ruger handgun, bullets, inositol powder, 22 separate baggies of crack cocaine, and a holster from Apartment 6.

{¶16} Orkies, also a CPD officer assigned to CGIC, was working in uniform on November 17, 2021. He explained that he responded to a radio transmission from Broering after Broering witnessed a hand-to-hand drug transaction involving a black Infiniti. Orkies testified that Keese was detained after he got out of his car and that a search of Keese's person revealed a gun. The State played Orkies's body-worn camera footage during his testimony.

{¶17} Howard, another uniformed CPD officer and member of the CGIC, testified that he also responded to the scene. He explained that he conducted the

search of Keese and that Keese told him that he had a gun. Howard also recovered a sock that contained narcotics and a scale from Keese's person.

{¶18} Kimble testified that she was the senior drug chemist at the Hamilton County Crime Laboratory. She testified as to the test results of the narcotics that were recovered from Keese's person and from Apartment 6. Kimble explained that the items that were recovered and tested came back positive for various quantities of cocaine, fluorofentanyl, and fentanyl.

{¶19} Wimsatt testified that he was a forensic drug chemist with the Hamilton County Coroner's Office and Crime Laboratory. He testified that he conducted a test on the digital scale Taylor recovered from Keese that showed a positive result for cocaine.

{¶20} Keese's girlfriend was called to testify, but asserted her Fifth Amendment privilege in response to all questions she was asked. The trial court therefore excluded her as a witness.

{¶21} On October 18, 2023, the jury returned guilty verdicts against Keese on all nine counts.

{¶22} On December 12, 2023, the trial court sentenced Keese. It merged Counts 1 and 4 and imposed a sentence of five to seven-and-a-half years in prison. It also merged Counts 2 and 5 and imposed a prison sentence of five years. It imposed an identical sentence with respect to Counts 3 and 6. It similarly merged Counts 7 and 9 and imposed a 12-month term of incarceration. As to Count 8, Keese was sentenced to two years in prison. The trial court ordered the sentences in Counts 8 and 9 to be served concurrently and the sentences in Counts 4, 5, and 6 to be served consecutively to one another and consecutively to the sentences in Counts 8 and 9. Keese was

therefore sentenced to an aggregate term of 17 to 19-and-a-half years in the Ohio Department of Rehabilitation and Correction. The trial court further imposed two to five years of post release control on Count 6, 18 months to three years of post release control on Counts 4 and 5, and two years of post-release control on Counts 8 and 9. The trial court credited 55 days that Keese spent in jail towards his prison time and remitted court costs and fines.

{¶23} Keese now appeals.

### *Analysis*

{¶24} On appeal, Keese raises four assignments of error. First, Keese argues that the trial court erred in denying his motion to suppress the firearm and controlled substances recovered from his person. Second, he argues that the trial court erred by denying his motion to suppress the items seized from his girlfriend's apartment. Third, he argues that the trial court violated double-jeopardy principles by sentencing him to separate prison sentences on Counts 4 and 5. Lastly, he argues that he received ineffective assistance of counsel in violation of the Sixth Amendment.

### *Suppression of Items Recovered from Keese*

{¶25} In his first assignment of error, Keese argues that he was forcibly stopped and searched in violation of his Fourth Amendment right against unreasonable search and seizure. More specifically, Keese contends that officers lacked reasonable suspicion to stop and detain him when he got out of his car. He argues that this lack of reasonable suspicion undercut officers' ability to search his person for weapons.

{¶26} We review a motion to suppress under a blended standard of review. *See In re J.T.*, 2023-Ohio-2695, ¶ 15-16 (1st Dist.). Under this standard, we accept the

trial court's findings of fact if they are supported by competent, credible evidence. *Id.* at ¶ 15. We then review de novo whether the facts meet the applicable legal standard. *Id.*

**{¶27}** The trial court analyzed the legality of Keese's detention under a probable cause standard, apparently believing, without expressly saying so, that Keese was under arrest when he got out of his car. *See State v. Jordan*, 2021-Ohio-3922, ¶ 19-20 (explaining probable cause standard for warrantless arrests). It determined that officers had probable cause to arrest Keese based on their observation of a hand-to-hand transaction. On appeal, Keese argues that officers lacked reasonable suspicion to detain him—a lesser standard than probable cause—thereby implicitly conceding that he was not actually arrested at the moment that he got out of his car. After reviewing the record, we agree with Keese that he was merely detained, rather than subject to arrest, when officers approached him at his car.

**{¶28}** Under *Terry v. Ohio*, 392 U.S. 1 (1968), the police may temporarily detain an individual for the purpose of investigation, without violating the Fourth Amendment, when the stop is justified by reasonable suspicion. While "reasonable suspicion" has no fixed legal meaning, it is something more than a hunch. *State v. Rogers*, 2022-Ohio-4535, ¶ 23 (1st Dist.). Instead, considering the totality of the circumstances, officers must have a particularized and objective basis for suspecting that the person they stopped was engaged in criminal activity. *Id.* at ¶ 22-23, citing *United States v. Cortez*, 449 U.S. 411, 417-418 (1981).

**{¶29}** Once a person has been lawfully stopped on the basis of reasonable suspicion, an officer may conduct a limited protective search for weapons if the officer has a justified belief that the person may be armed. *In re J.T.*, 2023-Ohio-2695, at ¶

16 (1st Dist.). A *Terry* stop and a protective search for weapons therefore require separate justifications. *Id*. A *Terry* stop must be supported by reasonable suspicion, and a protective search must be supported by a justified belief that the person possesses a weapon. *Id*.; *Rogers* at ¶ 23.

{¶30} The officers' decision to stop and detain Keese when he got out of his car was supported by reasonable suspicion. Both Broering and Bode testified that they witnessed Keese engage in what they believed to be a hand-to-hand drug transaction. Broering specifically described observing a man walk up to Keese's vehicle with cash in his hand and walk away without the cash but with a plastic bag appearing to contain drugs. Broering then witnessed Keese pull away but return seconds later to park his vehicle in the same location. From these facts and his experience, Broering concluded that he had likely witnessed a drug transaction. Bode recounted a similar version of events and reached a similar conclusion.

{¶31} Considering the totality of the circumstances, we hold that the officers had reasonable suspicion to stop Keese for the purpose of investigating his activities minutes later when he got out of his car. Both Broering and Bode observed a transaction that contained indicia of an unlawful drug sale: the exchange of cash for a baggie and a quick departure from the scene. This was more than a mere hunch that criminal activity had taken place. Rather, officers had good reason to suspect that Keese sold drugs to a customer.

{¶32} Arguing otherwise, Keese relies on cases that are factually inapposite to his: *State v. Pettegrew*, 2009-Ohio-4981 (8th Dist.), and *State v. Ward*, 2017-Ohio-8141 (1st Dist.). In *Pettegrew*, the Eighth District reversed the trial court's denial of the defendant's motion to suppress on the basis that a person reached into a vehicle

rather than engaging in an exchange with the driver. *Pettegrew* at ¶ 16. In *Ward*, an officer observed an individual lean into the defendant's vehicle, which was located in an area known for crime. *Ward* at ¶ 4. We reversed the decision of the trial court denying the motion to suppress, holding these facts insufficient to establish reasonable suspicion. *Id.* at ¶ 26.

{¶33} This case is distinguishable from both *Pettegrew* and *Ward*. Unlike the defendants in those cases, Keese was witnessed engaging in an actual transaction of what appeared to Broering to be drugs. Numerous courts considering similar fact patterns have held that an officer's observation of a suspected hand-to-hand drug transaction gives rise to reasonable suspicion for a *Terry* stop. *See, e.g., State v. Partin*, 2023-Ohio-4056, ¶ 18-19 (2d Dist.). We conclude no differently here.

{¶34} Because Keese was lawfully stopped, officers were permitted to conduct a protective sweep of his person, so long as they reasonably believed Keese presented a danger. *See State v. Henson*, 2022-Ohio-1571, ¶ 15-16 (1st Dist.). According to Howard, Keese admitted to possessing a weapon when he was detained at his car. Officers were therefore justified in patting Keese down for the purpose of their own safety. *See State v. Shalash*, 2021-Ohio-1034, ¶ 21-22 (10th Dist.) (finding protective sweep of car to be justified where police had knowledge of defendant's gun possession).

{¶35} We accordingly overrule Keese's first assignment of error.

### *Suppression of Items Recovered from Apartment 6*

{¶36} In his second assignment of error, Keese raises two issues. First, he argues that the trial court erred in determining that he did not have standing to challenge the warrant obtained to search Hall's apartment. Second, he argues that the

affidavit supporting the search warrant did not show a fair probability that contraband would be found in the residence.

### A. *Standing to Challenge the Search Warrant*

**{¶37}** To have standing to challenge a search under the Fourth Amendment, a defendant must have a reasonable expectation of privacy in the object of the search. *State v. Emerson*, 2012-Ohio-5047, ¶ 16. With regard to visitors to a home, an overnight guest may reasonably expect that belongings stored in the home will remain private, whereas a person who is merely present with the consent of the homeowner may not have such an expectation. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998); *State v. Brown*, 2013-Ohio-2720, ¶ 12 (1st Dist.). Thus, it is beyond dispute that overnight guests have standing to challenge a search of a residence. *State v. Dozier*, 2015-Ohio-2175, ¶ 7 (2d Dist.). The defendant bears the burden of establishing the status of an overnight guest with a reasonable expectation of privacy in the home. *Id.*

**{¶38}** In determining whether an overnight guest has standing to challenge a search, courts have highlighted certain key facts that are indicative of the status of an overnight guest. These include how often a person stays at the residence in question, how recently the person stayed there before the search, whether the person has a key or other method of access to the home, and whether the person stores belongings there. For example, in *State v. Winston*, 2012-Ohio-4743, ¶ 17 (2d Dist.), the Second District held that the trial court erred when it found that the defendant did not have standing as an overnight guest to challenge the search of his girlfriend's apartment. In that case, the evidence showed that the defendant occasionally stayed at the apartment, had clothing at the apartment, and spent the night at the apartment the day before the incident. *Id.*

{¶39}   Similarly, in *State v. Keith*, 2008-Ohio-6122, ¶ 13, 18 (10th Dist.), the Tenth District held that the trial court erred when it found that the defendant did not have standing to challenge the search of another person's apartment after testimony established that the defendant had stayed at the apartment two to three nights preceding his arrest, had keys to the apartment, had a room in the apartment, and could stay there whenever he pleased.

{¶40}   Here, as the trial court found, Keese testified that he spent the night at Apartment 6 two to three times a week and had done so the night before his arrest.  He kept belongings at the apartment and had a key to come and go.  Even Broering admitted that he had seen Keese at the apartment complex in the past when Broering had conducted undercover surveillance.  These facts suggest that Keese was an overnight guest, and overnight guests plainly have standing. *See Dozier*, 2015-Ohio-2175, at ¶ 7 (2nd Dist.).  Therefore, similar to the defendants in *Winston* and *Keith*, we conclude that Keese had standing to challenge the search of Apartment 6.

### B.  Whether the Warrant was Supported by Probable Cause

{¶41}   Keese next asserts that the affidavit that supported the search warrant for Apartment 6 did not demonstrate probable cause and, more specifically, did not create a nexus between the suspected crime and the place being searched.  The affidavit makes clear that officers were searching Apartment 6 based on the suspected drug transaction they witnessed between Keese and an unknown person in the parking lot.  But no witness testified that Apartment 6 was Keese's residence.  Thus, the question Keese raises is whether officers' suspicion that he was engaged in drug activity was sufficient to search Apartment 6.

**{¶42}** Probable cause for a search warrant is established where the affidavit in support of the warrant contains sufficient information that evidence is likely to be found at the place to be searched. *State v. Martin*, 2021-Ohio-2599, ¶ 11 (1st Dist.). This inquiry is heavily fact-intensive. *State v. Johnson*, 2024-Ohio-1147, ¶ 15 (1st Dist.). To pass Fourth Amendment muster, the affidavit must establish a nexus between the place being searched and the evidence being sought. *Id.* In determining whether an affidavit accomplishes this task, the judicial officer issuing a search warrant must make a practical, common-sense decision as to whether, given the totality of the circumstances, there is a fair probability that evidence of a crime will be found in the place that is the subject of the proposed search warrant. *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus.

**{¶43}** With regard to a search of a residence based on drug activity occurring outside the home, "[a] nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence." *State v. Phillips*, 2016-Ohio-5944, ¶ 16 (10th Dist.). When the nexus is borderline, "we are obligated to accord great deference to the probable cause determination made by the magistrate or judge who issues the search warrant and resolve any doubtful or marginal case in favor of upholding the search warrant[.]" *State v. Rieves*, 2018-Ohio-955, ¶ 36 (8th Dist.).

**{¶44}** The affidavit permitting officers to search Apartment 6 presents such a scenario, in that it establishes a minimal but legally sufficient nexus between Keese's drug activity outside the apartment and the probability that evidence would be found inside it. To be sure, the affidavit clearly recounts that Keese participated in drug activity. In the affidavit, Broering recounts the hand-to-hand transaction he witnessed

14

in the apartment parking lot and that a gun, drugs, and scale were found shortly thereafter. The affidavit also summarizes Broering's professional experience as a police officer who has worked in the field of narcotics apprehension. It therefore establishes probable cause to believe that Keese was engaged in drug activity.

**{¶45}** But the affidavit is somewhat sparse as to concrete facts specifically connecting Keese's drug activity to the apartment. To this end, the only fact connecting Keese to the apartment is that he had a key to get in. This alone is insufficient to establish probable cause, as mere access to a building does not support an inference that a person stores contraband there. Nor does the affidavit indicate, for example, that Keese himself came from the apartment before engaging in the hand-to-hand transaction or that Keese was approaching the apartment afterwards, facts courts have held to support probable cause in other cases. *See, e.g., State v. Young*, 2019-Ohio-4639, ¶ 21 (10th Dist.) (upholding search warrant for residence based on defendant's movements to and from the home in the time immediately preceding the transaction); *State v. Lackey*, 2023-Ohio-3720, ¶ 16-17 (1st Dist.) (upholding search where warrantless inspections of a defendant's trash revealed evidence of drug trafficking). In fact, only Keese's girlfriend was leaving the vehicle in the direction of the apartment, and only she was carrying groceries. The affidavit is therefore short on facts directly connecting Keese to Apartment 6.

**{¶46}** The affidavit, does, however, document statements by both Keese and his girlfriend upon which a reasonable person could rely in believing that evidence of Keese's drug activity would be found in Apartment 6. In that regard, the affidavit notes that, when Keese's girlfriend was stopped carrying groceries from the car to the apartment building, she initially said she was going to Apartment 5. The girlfriend

later admitted she lived in Apartment 6, not Apartment 5 as she first stated. This statement by the girlfriend could reasonably be interpreted as an effort to divert the police away from Apartment 6. The affidavit also indicates that "Keese later stated he would tell police that anything in the apartment was his, which he directed at [the girlfriend]." This could also be taken as a tacit admission by Keese that contraband was in the apartment. Finally, the affidavit notes that both the girlfriend and Keese had keys to Apartment 6.

{¶47} For guidance as to whether these allegations in Broering's affidavit establish probable cause, we look to *Johnson*, 2024-Ohio-1147 (1st Dist.). In *Johnson*, the defendant was placed under surveillance by police officers after being suspected of drug trafficking. *Id.* at ¶ 2. Using a confidential informant, the police conducted two controlled drug buys from the defendant. *Id.* Police then obtained a search warrant for a residence they believed to be associated with the defendant. *Id.* at ¶ 4, 9. The affidavit in support of the warrant contained information regarding the two controlled buys and a related a cell phone ping and described events of another day when the defendant fled from police. *Id.* at ¶ 5-8. This court held that the affidavit lacked a nexus between the defendant's drug trafficking and the residence. *Id.* at ¶ 21. In so doing, we emphasized that the affidavit did not include details about the defendant's movement before or after the two buys, nor did it suggest that the defendant's drug activity occurred "in or near" the searched residence. *Id.* at ¶ 17, 21. Rather, the affidavit merely established that the defendant was a suspected drug dealer and lived at the place to be searched in the weeks after he was observed selling drugs. *Id.* at ¶ 18. In holding that the trial court erred by not granting the defendant's motion to suppress, we noted that this was not a "doubtful or marginal case." *Id.* at ¶ 17.

{¶48} Several facts specific to Keese separate this case from *Johnson*. For one, both Keese and his girlfriend made statements implying the presence of contraband in Apartment 6, in essence corroborating officers' belief that evidence of crime would be located in the apartment. For another, Keese's drug activity occurred on the grounds of the apartment building, adjacent to the residence to be searched. Particularly given that we are to defer to the validity of the search warrant in marginal cases, we hold that this information was sufficient to establish probable cause to search Apartment 6. *See Rieves*, 2018-Ohio-955, at ¶ 36 (8th Dist.).

### C. Fruit of the Poisonous Tree

{¶49} Keese's final argument with regard to the motion to suppress is that the trial court committed plain error in not suppressing the fruit of the poisonous tree. More specifically, Keese contends that the trial court should have excised his statement about the apartment and the items seized from his person from the search warrant affidavit because this evidence was obtained in violation of his Fourth Amendment rights.

{¶50} Keese's argument fails because, as discussed above, Keese's detention and the officer's pat-down of his person were supported by reasonable suspicion. With regard to his statement, Keese raises no assignment of error challenging the admissibility of his statement to police. In the absence of such an argument, we lack a basis for excluding the statement from the search warrant affidavit. *See* App.R. 12(A). Keese's fruit-of-the-poisonous-tree argument is accordingly without merit.

{¶51} We therefore overrule Keese's second assignment of error.

### *Sentencing*

**{¶52}** In his third assignment of error, Keese argues that the trial court erred in imposing separate prison sentences on Counts 4 and 5, both of which allege that Keese trafficked a fentanyl-related drug compound. He raises this argument under the Double Jeopardy Clauses of the United States and Ohio Constitutions. Keese did not object to the imposition of separate sentences on Counts 4 and 5 before the trial court.

**{¶53}** For its part, the State concedes that the convictions in Counts 4 and 5 were allied offenses of similar import and that they thus should have merged for purposes of sentencing. Nonetheless, because Keese failed to object to the lack of merger, we review this issue for plain error.

**{¶54}** To reverse on plain error, we must find that (1) there was an error, (2) the error was plain, i.e., an obvious defect in the trial court proceedings, and (3) the error affected substantial rights, i.e., it affected the outcome. *State v. Merz*, 2021-Ohio-2093, ¶ 7 (1st Dist.). The requirement that allied offenses be merged is mandatory, and thus the failure to correctly merge convictions necessarily affects a substantial right and amounts to plain error. *Id.*

**{¶55}** In Counts 4 and 5, the jury convicted Keese of trafficking more than ten but less than 20 grams of fentanyl and flourofentanyl. To reach this amount, the State aggregated two separate drug quantities, each containing a mixture of fentanyl and flourofentanyl. One package contained just over three grams of the mixture, while the second contained just over nine grams. Together, they weighed slightly more than 12 grams. The State did not separate the amount of fentanyl and the amount of flourofentanyl in each quantity. Thus, based on the specific weights involved, it was

impossible for Keese to have trafficking both between ten and 20 grams of fentanyl *and* between ten and 20 grams of flourofentanyl when the entire weight of the mixture was just over 12 grams.

**{¶56}** In *State v. Pendleton*, 2020-Ohio-6833, ¶ 19-20, the Ohio Supreme Court held that R.C. 2925.03 does not allow separate punishments for multiple drug-trafficking convictions when the factual basis of the convictions is trafficking a mixture of heroin and fentanyl. Counts 4 and 5 suffer from the same problem, in that they rely upon a mixture to meet the gram requirement in the charged statute.

**{¶57}** Keese's third assignment of error is therefore sustained. The trial court should have merged Counts 4 and 5, as the State concedes. We accordingly reverse the trial court's sentences with respect to Counts 4 and 5 and remand the cause for resentencing as to those counts so that the State may choose which offense to pursue.

### *Ineffective Assistance of Counsel*

**{¶58}** In his final assignment of error, Keese argues that his trial attorneys represented him ineffectively in violation of his Sixth Amendment right to counsel. He raises three issues to support his contention. First, Keese argues that his counsel was ineffective in failing to object when the trial court sentenced him to multiple punishments for the same offense. Second, he argues that his counsel was ineffective in failing to argue that evidence unlawfully obtained from the November 17, 2021 search of Keese and his car should have been excised from the consideration of whether probable cause supported the search warrant for Apartment 6 under the fruit-of-the-poisonous-tree doctrine. Third, Keese argues that he received ineffective assistance of counsel because his counsel failed to argue against the good-faith exception to the exclusionary rule.

{¶59}  To succeed on a claim of ineffective assistance of counsel, Keese must show that (1) trial counsel's performance was deficient, and (2) the deficient performance deprived him of a fair trial.  *State v. Akins*, 2024-Ohio-1491, ¶ 45 (1st Dist.).  An appellant's "failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other."  *Id.*  "[T]o show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."  *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989).

### A.  Sentencing

{¶60}  Keese argues that his counsel was ineffective by failing to object to the imposition of separate punishments on Counts 4 and 5.  Our disposition of his third assignment of error renders this issue moot, and we decline to address it.

### B.  Fruit of the Poisonous Tree

{¶61}  Keese next argues that defense counsel was ineffective by not arguing that parts of the search warrant affidavit derived from the search of Keese's person and car should have been excised as fruit of the poisonous tree.  This argument relies upon the assumption that police acted in violation of the Fourth Amendment in stopping Keese at his car on November 17, 2021, and in searching him for weapons.  We have held with regard to Keese's first assignment of error, however, that both actions were constitutionally justified.  As a result, Keese cannot demonstrate that his counsel acted deficiently in failing to advance a nonmeritorious argument.  *See, e.g., State v. C.W.*, 2018-Ohio-1479, ¶ 53 (10th Dist.) ("The failure to raise nonmeritorious objections is not deficient performance.").  Nor can he demonstrate that he was prejudiced, given that the outcome of his case would not have been different had his

attorney argued the fruit-of-the-poisonous-tree doctrine. We accordingly reject this portion of Keese's argument.

### C. Exclusionary Rule

{¶62} Keese's final argument is that defense counsel was ineffective for failing to anticipate and argue against the good-faith exception to the exclusionary rule. This argument fails, as we have concluded that the warrant was supported by probable cause. Keese's counsel did not perform deficiently by failing to raise a nonmeritorious argument. *See id.* at ¶ 53.

{¶63} We overrule Keese's fourth assignment of error.

### Conclusion

{¶64} For the forgoing reasons, we reverse the sentence of the trial court as to Counts 4 and 5 and remand the cause for the limited purpose of resentencing Keese on those counts so that the State may choose which count to pursue. We affirm the judgment of the trial court as to the remaining assignments of error raised by Keese in this appeal.

Judgment affirmed in part, reversed in part, and cause remanded.

CROUSE, P.J., and WINKLER, J., concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.